877 A.2d 229

STATE OF NEW JERSEY, PLAINTIFF–RESPONDENT, v.
RICHARD FEASTER (NOW KNOWN AS SEAN PADRAIC
KENNEY), DEFENDANT–APPELLANT.

Argued January 31, 2005—Decided July 14, 2005.

*Isabel K. McGinty* and *Michael A. Priarone,* Designated Counsel, argued the cause for appellant (*Yvonne Smith Segars,* Public Defender, attorney).

*Debra A. Owens,* Deputy Attorney General, argued the cause for respondent (*Peter C. Harvey,* Attorney General of New Jersey, attorney).

Justice ALBIN delivered the opinion of the Court.

Defendant Richard Feaster, now known as Sean Padraic Kenney,[1] was convicted of capital murder by a jury and sentenced to death. This Court upheld his conviction and sentence on direct appeal, *State v. Feaster,* 156 *N.J.* 1, 18, 716 *A.*2d 395 (1998) (*Feaster I*), *cert. denied sub nom. Kenney v. New Jersey,* 532 *U.S.* 932, 121 *S.Ct.* 1380, 149 *L.Ed.*2d 306 (2001), and on proportionality review, *State v. Feaster,* 165 *N.J.* 388, 393, 757 *A.*2d 266 (2000) (*Feaster II*), *cert. denied sub nom. Kenney v. New Jersey,* 532 *U.S.* 932, 121 *S.Ct.* 1380, 149 *L.Ed.*2d 306 (2001). Defendant then filed a petition for post-conviction relief (PCR) in the Superior Court in which he alleged numerous grounds for reversal, centered primarily on the claim that at trial he was denied the effective assistance of counsel guaranteed by the federal and state constitutions. After the PCR court rejected defendant's petition, he sought review by this Court.

In this opinion, we address only one issue raised by defendant in his PCR petition. At the PCR hearing, defendant intended to

[1] On September 27, 1999, the Superior Court, Law Division, entered a judgment authorizing defendant to assume the name of Sean Padraic Kenney, effective October 30, 1999.

call Michael Sadlowski, a key State's witness who had recanted his trial testimony in a certified statement made to defendant's attorneys. Before Sadlowski took the stand at the hearing, the prosecutor indicated to Sadlowski's attorney that there would be "considerations" if he testified consistent with his recantation statement. When called as a witness, Sadlowski withdrew his certified statement and invoked his Fifth Amendment privilege against self-incrimination. Defendant contends that the prosecutor's thinly veiled threat to prosecute Sadlowski for perjury if he testified in defendant's favor deprived him of a critical witness. We agree. We will not theorize whether Sadlowski would have invoked the privilege even in the absence of a prosecutorial threat. We now hold that the prosecutor substantially interfered with Sadlowski's decision to testify and, therefore, denied defendant a witness who might have supported his claim that he was wrongly convicted and sentenced to death. The prosecutor's interference with that witness's decision to testify violated defendant's state constitutional due process and compulsory process rights.

## I.

### A.

We first provide a brief overview of the State's case against defendant to place in perspective the importance of Sadlowski's trial testimony. On the evening of October 6, 1993, the lifeless and bloodied body of Keith Donaghy was found lying on the office floor of the Family Texaco gas station in Deptford Township. Donaghy, the gas station attendant, died from a single shotgun blast to his head at close range. Police investigators had little success in breaking the case until defendant's friend, Tina Shiplee, came forward one month later with information that implicated both defendant and his friend, Michael Mills, in the crime.

The next day, investigators questioned Mills, who led them to a sawed-off shotgun that ballistics tests later identified as the

murder weapon. The investigators retrieved the shotgun from the bottom of a river along the route between the Family Texaco and the Columbia Café, a bar in National Park where Mills and defendant socialized on the night of the murder. Defendant was arrested shortly afterwards.[2]

At trial, defendant's friends testified to defendant's whereabouts on the night of October 6 and to incriminating statements he made after the murder. "The State's case was based almost exclusively on the inculpatory statements made by defendant after the murder." *Feaster I, supra,* 156 *N.J.* at 56, 716 *A.*2d 395. No direct physical evidence linked defendant to the murder.

The jury learned that two weeks before the murder, defendant borrowed a twenty-gauge sawed-off shotgun from his friend, Daniel Kaighn, for the purpose of collecting a debt from his employer. Defendant placed the shotgun in a blue gym bag and that same day returned the gun in the bag to Kaighn along with a $30 payment for the gun's use. Around that time, Shiplee gave defendant permission to store a gym bag in the back of her car after defendant explained that his parents had "kicked him out" of their home. Shiplee later felt the bag and suspected that it contained a gun, but never looked inside to confirm her suspicion.

On the night of the murder, defendant got together at the Columbia Café with a group of friends that included Sadlowski, Mills, Shiplee, and defendant's girlfriend. That evening, Shiplee requested that defendant remove the gym bag from her car. Later, when Shiplee returned to her car, the bag was gone. At around 8:00 p.m., defendant and Mills borrowed a car and left the bar for about one hour. Before leaving, defendant told two of his friends that he needed to collect some money from his boss. At 8:30 p.m., Donaghy's body was discovered at the Family Texaco gas station, approximately a twelve-minute drive from the Columbia Café. Shiplee testified that after defendant came back to the

---

[2] In June 1994, Mills committed suicide.

bar, she overheard him tell Mills and Sadlowski "that he can't believe that he killed the guy and didn't get any money."

Another witness bolstering the State's case was Kevin Wrigley, a jailhouse informant who shared a holding cell in the county jail with defendant for a brief time while defendant awaited trial. Wrigley testified that defendant described to him shooting a person in the head at "point-blank" range. Defendant explained that before he joined the Marines he wanted "to see what it felt like" to kill a person.

Sadlowski offered some of the most damaging testimony against defendant. Sadlowski, who considered defendant to be a "good friend," had played football and "partied" with defendant in high school. On the night of the murder, Sadlowski drove defendant and Mills to the Columbia Café, arriving between 7:00 and 8:00 p.m. At the bar, defendant tried to borrow a car so that he could "get money off his boss." Sometime before 9:00 p.m., defendant left the bar and did not return until shortly before 10:00 p.m., at which time he got into an argument with his girlfriend.

At about 10:00 p.m., Sadlowski and defendant drove to Sadlowski's apartment. During the ride, defendant repeatedly urged Sadlowski "to watch the news" when they got to the apartment. Upon their arrival, they began drinking beer. Later, Shiplee, who lived with Sadlowski, joined them, and all three watched television, flipping through the channels. When they switched to a channel with news about a "murder in South Jersey," defendant told Sadlowski "to check this one part out" and to "turn it up a little bit." Defendant was "focused on the news" about "a gas station attendant [who] was shot and killed" in Deptford.

After the news, defendant said, "I can't believe I did this shit. I can't believe this. Why me?" Sadlowski and defendant then made their way out to the apartment's balcony where defendant continued, "I can't believe I did this shit; why me?" Back in the apartment, defendant and Sadlowski drank more beer and played cards until Sadlowski decided to take his friend home.

After leaving the apartment, defendant was "all hyped up," cursing at people in the street, making inflammatory remarks, and attempting to pick a fight. As they approached the car, Sadlowski asked defendant "what the hell is going on." During the drive, defendant repeated "a couple of times" that "his brains went all over the place." According to Sadlowski, defendant confided that "he shot the guy, you know, shot his brains all over the place." When Sadlowski asked him if he was serious, he replied, "Yeah, man, his brains are all over the place." While revealing these details, defendant had "tears in his eyes," and said again, "I can't believe I did this shit." Sadlowski did not inquire where the shooting had occurred, having connected defendant's grisly account with the news story about "the guy [who] got shot in Deptford." Sadlowski dropped defendant off at his apartment and avoided contact with defendant thereafter.

"The primary defense strategy was characterized by a sustained attack on the credibility of key State witnesses," *Feaster I, supra,* 156 *N.J.* at 27, 716 *A.*2d 395, and the attack on Sadlowski was no exception. Sadlowski was cross-examined about the deal he struck with the State for testifying against defendant. Before defendant's trial, Sadlowski entered into a plea agreement with the State to dispose of burglary and theft charges pending against him. In exchange for Sadlowski's plea to the burglary charge, which carried a maximum potential sentence of five years, and his promise to "testify truthfully" in defendant's case, the State limited Sadlowski's sentence to a custodial term not to exceed thirty days in the county jail and dismissed the theft charge. Sadlowski acknowledged that he would not have cooperated with the prosecution without a favorable plea agreement and that he had a penchant for using false names. Sadlowski also was impeached with his prior criminal record, including an aggravated assault charge filed just ten days before he gave his final statement to the police in this case.

Defense counsel probed Sadlowski's ability to recall key events and his state of mind on the night of the murder. Sadlowski

admitted that he had been "[d]rinking a lot" that evening, that he was "hammered," and that he had possibly ingested cocaine. Defense counsel pointed out the discrepancies between Sadlowski's testimony and his prior statements, particularly his failure to mention in his initial statements to the police that defendant confessed to "[blowing] somebody's head off."

### B.

In 1996, a Gloucester County jury convicted defendant of capital murder, felony murder, first-degree robbery, possession of a sawed-off shotgun, and other lesser-included offenses. On the capital murder conviction, the jury sentenced defendant to death. On the robbery conviction, the court sentenced defendant to a consecutive twenty-year term of imprisonment with a ten-year parole disqualifier, and on the shotgun possession conviction to a concurrent five-year term of imprisonment. The felony murder and other lesser offenses were merged into the convictions for which defendant was sentenced.

In 1998, this Court upheld defendant's capital murder, robbery, and gun possession convictions and sentences. *Feaster I, supra,* 156 *N.J.* at 93, 716 *A.*2d 395. In 2000, this Court upheld defendant's death sentence after conducting proportionality review. *Feaster II, supra,* 165 *N.J.* at 393, 757 *A.*2d 266. In 2001, defendant filed a verified petition for post-conviction relief, alleging twenty-two separate grounds for reversing either his capital conviction or his death sentence. In 2003, the PCR court conducted a hearing and took testimony from witnesses. The PCR court denied defendant's petition for relief and request for a new trial. In 2004, defendant appealed to this Court as of right. *R.* 2:2–1(a)(3).

### C.

We now turn to the events surrounding defendant's failed attempt to call Michael Sadlowski as a witness at the PCR hearing. In July 2001, defendant's PCR counsel and a defense

investigator met with Sadlowski in Bayside State Prison, where he was incarcerated. Sadlowski signed a certified statement in which he averred that important parts of his trial testimony against defendant were false and that he was induced to give that testimony because of threats and promises from the prosecutor's office. The certified statement read:

Statement of Michael Sadlowski 7/10/01—Bayside State Prison—

Michael Sadlowski, presently an inmate at Bayside State Prison—#286305/581123B certify [sic] as follows:

(1) I was a witness at the murder trial of [defendant] Richard Feaster in March of 1996.

(2) When I testified at the trial that Richard Feaster admitted the murder of Keith Donaghy to me, I was not telling the truth.

(3) Richard Feaster has never told me that he killed anyone.

(4) I testified at his trial that he admitted the killing because the prosecutor's office said I would go to prison on a charge I had at the time and that they would charge me with conspiracy on the murder charge.

(5) The prosecutor's investigator, . . . and Assistant Prosecutor . . . told me that if I testified against Richard Feaster they would help me with my charge and that I would not be charged with conspiracy.

(6) Before I testified, the investigator and the prosecutor asked me to work into my testimony as many bad things about Richard Feaster as I could think of. As a result, during my testimony I said Rich was a violent person who liked to beat people up.

I have read the above statement of seven [handwritten] pages and I certify that the foregoing statement is true. I am aware that if any of the foregoing statements are wilfully false I am subject to punishment.

Relying on that statement, in March 2002, defendant submitted a Notice of Motion for a New Trial based on newly discovered evidence. About one year after giving his statement, Sadlowski reaffirmed in a meeting with the defense investigator and defendant's two PCR attorneys that he "stood by" the recantation of his trial testimony.

In August 2003, pursuant to a writ commanding his presence from state prison, Sadlowski appeared before the PCR court to give testimony. Defendant's PCR counsel conveyed to the court that Sadlowski wished to consult with counsel before he testified. Louis Fletcher, Esq., later was assigned to represent Sadlowski at the PCR hearing. Fletcher sought both to retract Sadlowski's

certified statement and to invoke his Fifth Amendment privilege against self-incrimination without placing Sadlowski on the stand. Defendant's PCR counsel insisted that any repudiation of the recantation had to come from Sadlowski himself, and "not from his lawyer."

The PCR court permitted Sadlowski to take the stand for the limited purpose of withdrawing his certified statement and invoking his Fifth Amendment privilege. Fletcher engaged in the following colloquy with Sadlowski:

Q:[D]id you have the opportunity to speak with me before court today concerning your statement?

A: Yeah.

Q: Did you make a request to me to withdraw that statement on the record?

A: Yeah.

Q: It is your desire, then, to retract, withdraw that statement, is that correct, sir?

A: Yes.

Q: Is it your desire to invoke your Fifth Amendment privilege against self-incrimination against any and all questions?

A: Yes.

Q: Did anybody force you, threaten you to withdraw this statement?

A: No.

Defendant's PCR counsel objected to this procedure. He argued that Sadlowski waived his privilege against self-incrimination when he withdrew his certified statement on the stand and that defense counsel had a right to cross-examine him on the substance of his testimony. Defense counsel contended that it was unfair to allow Sadlowski to "say something in aid of the State's case" and then hide behind the privilege. The PCR court concluded that Sadlowski had testified at defense counsel's request and had not waived the privilege. The court also refused to strike Sadlowski's testimony.

When PCR counsel inquired whether there had been a threat of prosecution against Sadlowski, the Assistant Prosecutor responded:

Judge, when I talked to—*when I talked to Mr. Fletcher I gave him his statement and said this is his statement. If he testifies the way he does, then there are*

*considerations.* That's all I said. Then Mr. Fletcher took that statement and talked to his client. I don't know what he told him. So, there is no threat.

[(Emphasis added).]

Defense counsel argued that it was "fundamentally unfair" for the State to raise the specter of a perjury prosecution with the recanting witness, thus threatening him into silence. Counsel noted that "the State has no real means of discerning the truth or falsity of the recantation as opposed to trial testimony. Although, in its opinion the State may feel they know the difference." That being so, counsel submitted that "[t]o threaten the witness if he recants ... to me seems like the height of unfairness." Defense counsel requested that the State or the PCR court grant Sadlowski immunity "so [Sadlowski] can come to court and tell [whether] the truth is" what he said at trial or in his certified statement.

The prosecutor refused to grant Sadlowski immunity, asserting that the State had done nothing "inappropriate." The court then granted counsel time to brief the issue and excused Sadlowski without requiring him to explain his reasons for invoking the Fifth Amendment privilege.

When the hearing resumed six days later, defendant moved to have the court compel Sadlowski to testify. In denying the motion, the court observed that "it's clear on its face as to why he invoked his privilege." The court noted that Sadlowski invoked the privilege because he was subject to "a possible perjury charge." The judge recognized that "the *considerations* that the prosecutor was alluding to [were] the possibility of perjury charges...." (Emphasis added). The court, nevertheless, concluded that the prosecutor's warning to Sadlowski's attorney did not influence Sadlowski's decision to invoke the Fifth Amendment because he "knew he had some criminal exposure." In denying defendant's petition for post-conviction relief, the court did not consider Sadlowski's certified statement recanting his trial testimony.

## II.

### A.

In his certified statement, Sadlowski averred that he had given false testimony against defendant as a result of prosecutorial inducements. The State, both in its brief and at oral argument, did not dispute that the assistant prosecutor's warning to Sadlowski was intended to convey the message that he might face a perjury or false swearing prosecution if he disavowed his trial testimony and testified consistent with his statement to PCR counsel. In the wake of the prosecutor's warning, Sadlowski "withdrew" his certified statement and invoked his Fifth Amendment privilege in response to questioning by his attorney.

As a preliminary matter, we note that the PCR judge never should have permitted Fletcher, an attorney who did not represent a party in the case, to question a defense witness. Fletcher had no role in the proceedings other than to advise his client. The judge then compounded that error by accepting Sadlowski's testimony after he invoked the privilege as a shield against cross-examination.

When a witness's direct testimony concerns a matter at the heart of a defendant's case, the court should strike that testimony if the witness relies on the privilege against self-incrimination to prevent cross-examination. *See, e.g., United States v. Brooks,* 82 *F.*3d 50, 54 (2d Cir.), *cert. denied,* 519 *U.S.* 907, 117 *S.Ct.* 267, 136 *L.Ed.*2d 191 (1996); *Dunbar v. Harris,* 612 *F.*2d 690, 692 (2d Cir.1979); *United States v. Rogers,* 475 *F.*2d 821, 827 (7th Cir.1973); *Fountain v. United States,* 384 *F.*2d 624, 628 (5th Cir.1967), *cert. denied sub nom. Marshall v. United States,* 390 *U.S.* 1005, 88 *S.Ct.* 1246, 20 *L.Ed.*2d 105 (1968); *United States v. Cardillo,* 316 *F.*2d 606, 611 (2d Cir.), *cert. denied,* 375 *U.S.* 822, 84 *S.Ct.* 60, 11 *L.Ed.*2d 55 (1963). One of the essential purposes of cross-examination is to test the reliability of testimony given on direct-examination. *See State v. Branch,* 182 *N.J.* 338, 348, 865 *A.*2d 673 (2005); *see also Neighbour v. Matusavage,* 128 *N.J.L.*

331, 333, 25 *A*.2d 868 (E. & A.1942). Generally, direct testimony cannot be deemed reliable unless tested in the "crucible of cross-examination." *Branch, supra*, 182 *N.J.* at 348, 865 *A*.2d 673. We recognize the fundamental unfairness of permitting such testimony to be considered by the trier of fact.

Here, Sadlowski's testimony was not collateral. Indeed, his testimony went to the core of defendant's motion for a new trial. Defendant was denied the opportunity to determine why Sadlowski certified under penalty of perjury that his trial testimony was false, why he withdrew that certification, and, more particularly, whether that withdrawal was directly related to the prosecutor's threat.

We can never know whether Sadlowski would have invoked the privilege in the absence of the prosecutor's threat. We must presume that Sadlowski understood the nature of the threat and that it caused him to invoke the privilege. We, therefore, hold that the prosecutor substantially interfered with Sadlowski's decision to testify in this capital case, thereby violating defendant's state constitutional due process and compulsory process rights.

 Post-conviction relief is a defendant's last opportunity to raise a constitutional challenge to the fairness and reliability of a criminal verdict in our state system. *State v. Rue*, 175 *N.J.* 1, 18, 811 *A*.2d 425 (2002). A PCR hearing in a capital case is not a *pro forma* exercise, but a meaningful procedure to ensure that the trial that led to a sentence of death was as fair as the lot of humanity permits. *Ibid.* Not only the defendant, but the " 'state and its citizens have an overwhelming interest in insuring that there is no mistake in the imposition of the death penalty.' " *State v. Martini*, 144 *N.J.* 603, 617, 677 *A*.2d 1106 (1996) (*Martini III*) (quoting *State v. Koedatich*, 112 *N.J.* 225, 332, 548 *A*.2d 939 (1988) (*Koedatich II*), *cert. denied*, 488 *U.S.* 1017, 109 *S.Ct.* 813, 102 *L.Ed.*2d 803 (1989)). Indeed, our interest in the reliability of death sentences carries such weight that we do not permit a capital defendant to waive his right to post-conviction relief. *Martini III, supra*, 144 *N.J.* at 616–17, 677 *A*.2d 1106.

■■■ This Court's jurisprudence has underscored the importance of fair play at every stage of a capital proceeding. We are mindful that a death sentence is " 'profoundly different from all other penalties,' " *State v. Ramseur,* 106 *N.J.* 123, 326, 524 *A.*2d 188 (1987) (quoting *Lockett v. Ohio,* 438 *U.S.* 586, 605, 98 *S.Ct.* 2954, 2965, 57 *L.Ed.*2d 973, 990 (1978) (plurality opinion)), *cert. denied sub nom. Ramseur v. Beyer,* 508 *U.S.* 947, 113 *S.Ct.* 2433, 124 *L. Ed.*2d 653 (1993), and of the heightened " 'need for reliability in the determination that death is the appropriate punishment in a specific case.' " *Ibid.* (quoting *Woodson v. North Carolina,* 428 *U.S.* 280, 305, 96 *S.Ct.* 2978, 2991, 49 *L.Ed.*2d 944, 961 (1976)). The prosecutor has a "special duty to seek justice" in a capital case, and "conduct that falls short" of that duty must be "scrupulously reviewed." *Feaster I, supra,* 156 *N.J.* at 59, 716 *A.*2d 395 (citing *State v. Biegenwald,* 106 *N.J.* 13, 40, 524 *A.*2d 130 (1987) (*Biegenwald II*)).

■■■ An accused in a criminal case has a constitutional right to present witnesses in his defense, pursuant to the due process and the compulsory process provisions of the federal and state constitutions. *N.J. Const.* art. I, ¶¶ 1,[3] 10; *see also U.S. Const.* amends. V, VI, XIV § 1. "The right to offer the testimony of witnesses, and to compel their attendance, ... is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies." *Washington v. Texas,* 388 *U.S.* 14, 19, 87 *S.Ct.* 1920, 1923, 18 *L. Ed.*2d 1019, 1023 (1967). In a capital case, the need for compulsory process of a recanting witness at a post-conviction relief hearing should be self-evident. *See N.J. Const.* art. I, ¶ 10. The suggestion that even a well-intentioned prosecutor intimidated a key defense witness in a

---

[3] Although our Constitution does not contain a due process clause, the right to due process is implicit in Article I, Paragraph 1. *E.g., State v. Baker,* 81 *N.J.* 99, 114 n.10, 405 *A.*2d 368 (1979).

capital case into refusing to testify at a PCR proceeding requires close examination.[4]

In an adversarial criminal proceeding, the "search for truth" is not well served when the State attempts to fortify its case "by sealing the lips of witnesses." *State v. Fort,* 101 *N.J.* 123, 131, 501 *A.*2d 140 (1985). The basic premise of our judicial system is " 'that the fullest disclosure of the facts will best lead to the truth and ultimately to the triumph of justice.' " *State v. Jamison,* 64 *N.J.* 363, 375, 316 *A.*2d 439 (1974) (quoting *In re Richardson,* 31 *N.J.* 391, 396, 157 *A.*2d 695 (1960) (internal quotations omitted)). With that principle in mind, a defendant's due process rights are violated when there is "substantial government interference with a defense witness' free and unhampered choice to testify...." *United States v. Hammond,* 598 *F.*2d 1008, 1012 (5th Cir.1979) (internal quotations omitted), *reh'g granted,* 605 *F.*2d 862, 864 (5th Cir.1979) (modifying remand to permit defendant to choose between having new trial or accepting prior judgment); *see also Newell v. Hanks,* 283 *F.*3d 827, 837 (7th Cir.2002) (same); *United States v. Vavages,* 151 *F.*3d 1185, 1188 (9th Cir.1998) (same); *cf. Lambert v. Blackwell,* 387 *F.*3d 210, 260 (3d Cir.2004) ("In order to violate the Constitution, the government's conduct must have 'substantially interfered' with a witnesses's [sic] choice to testify.").

We have admonished both trial judges and prosecutors when they have improperly interfered with a defendant's right to call witnesses in his own defense. In *Jamison, supra,* the trial court substantially interfered with a defense witness's decision to testify. 64 *N.J.* at 374–77, 316 *A.*2d 439. The witness, who had previously given a statement to the prosecutor implicating the defendant, was prepared to confess to the crimes for which the defendant was on

---

[4] Despite the grisly nature of the crime, this Court—like all courts—has an obligation to ensure the fairness of the proceedings. We cannot subscribe to our dissenting colleague's implication that threats to a defense witness at a PCR hearing are less objectionable than similar threats to a trial witness. *See post* at 279, 877 *A.*2d at 256–57.

trial. *Id.* at 368–69, 316 *A.*2d 439. The trial judge advised the witness, while sworn and on the stand, "(a) that his statements would be used against him; (b) that he had a right to assigned counsel; (c) that he had a right to remain silent; and (d) that he could receive 21 years for the offenses and would 'probably' be so sentenced if before the judge." *Id.* at 369, 316 *A.*2d 439. The judge also "directed that a public defender" represent him. *Id.* at 369–70, 316 *A.*2d 439. After consulting with assigned counsel, the witness had a change of heart and denied that he had committed the crime. *Id.* at 370, 316 *A.*2d 439. When the defendant called the witness to testify, he asserted his Fifth Amendment privilege. *Id.* at 371–73, 316 *A.*2d 439.

We disapproved of the trial judge's interference and held that the "first concern of the court should have been the free flow of evidence for the enlightenment of the jury in that trial." *Id.* at 376, 316 *A.*2d 439. We further noted that "the wise judicial course would have been, and ordinarily will be, to leave the matter of suspicion of criminality attendant upon the actions of the prospective witness to the prosecutor, for such attention *at the conclusion of the case* as he might deem warranted." *Ibid.* (emphasis added). In reversing the defendant's conviction, we observed that "there should have been weighed in the balance the more immediate interests of the defendant on trial and those of the general public to the fullest disclosure of the relevant evidence before the trial jury before any solicitude for protection of the volunteering witness." *Id.* at 377, 316 *A.*2d 439.

We now turn to the specific issue raised in this case: improper prosecutorial interference with a defendant's right to call a witness. In *Fort, supra,* we condemned the prosecutorial practice of placing a provision in a plea agreement barring a codefendant from testifying for a defendant. 101 *N.J.* at 130–31, 501 *A.*2d 140. In that case, the two defendants and two codefendants were arrested in an apartment and charged with various offenses related to drug distribution activities. *Id.* at 125–26, 501 *A.*2d 140. The two codefendants entered into plea agreements with the State

in exchange for recommendations for lenient sentences. *Id.* at 126, 501 *A.2d* 140. As part of the deal, the codefendants "were required by the prosecutor not to testify for defendants." *Id.* at 124, 501 *A.2d* 140. At the time of her plea, one codefendant made a statement that ostensibly supported the defendants' claim of innocence. *Id.* at 126, 501 *A.2d* 140. Both codefendants indicated to defendants' counsel that they would not violate their plea agreements "by testifying for defendants." *Id.* at 126–27, 501 *A.2d* 140. The defendants did not call the codefendants to testify and were found guilty of the drug offenses. *Id.* at 127, 501 *A.2d* 140.

We concluded that the State's " 'no testimony' agreement" with the codefendants "violated defendants' constitutional rights to due process and to present witnesses in their favor." *Id.* at 131, 501 *A.2d* 140. We also rejected the State's argument that its conduct was harmless because the codefendants, who had yet to be sentenced, inevitably would have invoked their Fifth Amendment privilege and avoided testifying. *Id.* at 130–31, 501 *A.2d* 140. As a result of the State's extracting a "no testimony" agreement from the codefendants, it was "practically impossible to determine whether a witness refused to testify because of the privilege against self-incrimination or because of a desire to perform the promise." *Id.* at 131, 501 *A.2d* 140.

In reversing the defendants' convictions in *Fort, supra,* 101 *N.J.* at 129, 501 *A.2d* 140, we relied on *Webb v. Texas,* 409 *U.S.* 95, 93 *S.Ct.* 351, 34 *L.Ed.*2d 330 (1972) (per curiam), which focused on judicial interference with a defense witness's decision to testify. In *Webb, supra,* the United States Supreme Court reversed a state court conviction on due process grounds "because the trial judge had used such 'unnecessarily strong terms' in warning a defense witness about perjury that he 'effectively drove the witness off stand. . . .' " *Fort, supra,* 101 *N.J.* at 129, 501 *A.2d* 140 (quoting *Webb, supra,* 409 *U.S.* at 98, 93 *S.Ct.* at 353, 34 *L.Ed.*2d at 333). The Court reasoned that the judge "coerce[d] the only defense witness into refusing to testify" by threatening the wit-

ness that if he lied he would be indicted for perjury. *Webb, supra,* 409 *U.S.* at 96–98, 93 *S.Ct.* at 352–53, 34 *L.Ed.*2d at 332–33. We also noted approvingly in *Fort, supra,* authority from other federal and state courts condemning governmental threats to defense witnesses that "impinged on a defendant's right to offer witnesses in his favor." 101 *N.J.* at 129–30, 501 *A.*2d 140.[5]

Several of those cases provide useful comparisons to the present facts. In *United States v. Morrison,* an Assistant United States Attorney (AUSA) sent at least three messages through defense counsel to the defendant's juvenile witness, warning her that if she testified to exculpate the defendant and implicate herself in the crime, she could be subject to prosecution on drug and federal perjury charges. 535 *F.*2d 223, 224–25 (3d. Cir.1976). The AUSA then subpoenaed the witness to his office, and there, in the company of three law-enforcement officers, "he once again impressed upon her the dangers of testifying" with a new "barrage of warnings." *Id.* at 225–26. Although the witness answered some questions when called to testify, she invoked her Fifth Amendment privilege against self-incrimination on at least thirty occasions, thereby depriving the defendant of her exculpatory testimony. *Id.* at 226.

The Court of Appeals found that the "pressure brought to bear on [the witness] by the [AUSA] interfered with the voluntariness of her choice and infringed defendant's constitutional right to have her freely-given testimony." *Id.* at 228. Given that the prosecutor's threats "prevented the defendant's witness from testifying freely before the jury," the court was unwilling to indulge in the

---

[5] In *Fort, supra,* we cited the following cases with approval: *United States v. Goodwin,* 625 *F.*2d 693, 702–03 (5th Cir.1980); *United States v. Hammond,* 598 *F.*2d 1008, 1012–15 (5th Cir.1979); *United States v. Morrison,* 535 *F.*2d 223, 226–28 (3d Cir.1976); *United States v. Thomas,* 488 *F.*2d 334, 335–36 (6th Cir.1973); *Bray v. Peyton,* 429 *F.*2d 500, 501–02 (4th Cir.1970); *State v. Brown,* 543 *S.W.*2d 56, 58–59 (Mo.Ct.App.1976); *People v. Shapiro,* 50 *N.Y.*2d 747, 431 *N.Y.S.*2d 422, 409 *N.E.*2d 897, 903–05 (1980).

assumption that "the jury would not have believed the [witness's] testimony or that the error [was] harmless." *Ibid.*[6] Additionally, the court noted that the AUSA's "good faith" was not "relevant to an inquiry into whether a defendant was denied his constitutional right." *Id.* at 227 (emphasis removed).[7]

The Court of Appeals reversed the defendant's conviction, and fashioned a remedy to ensure a fair trial on remand. *Id.* at 228–29. The court took into consideration that the AUSA's conduct "caused the defendant's principal witness to withhold out of fear of self-incrimination testimony which would otherwise allegedly have been available to the defendant," and that continuing fear might induce her to withhold her testimony at a new trial. *Id.* at 229. The court's remedy returned the defendant to the position closest to where he stood before the prosecutorial threats, giving the

---

[6] *Morrison, supra,* held that, despite the absence of a general duty to warn witnesses of the privilege against self-incrimination, a trial court may in its discretion issue such a warning. 535 *F.*2d at 228. We strongly discourage our courts from providing such warnings to the detriment of defendants' due process rights. *See, e.g., Jamison, supra,* 64 *N.J.* at 375–76, 316 *A.*2d 439 (observing that judge's "first concern ... should have been the free flow of evidence for the enlightenment of the jury in that trial"); *see also Webb, supra,* 409 *U.S.* at 98, 93 *S.Ct.* at 353, 34 *L.Ed.*2d at 333 (disapproving of trial judge's "threatening remarks" that "effectively drove [the defendant's] witness off the stand").

[7] *See also United States v. Smith,* 478 *F.*2d 976, 979 (D.C.Cir.1973) ("Even if the prosecutor's motives were impeccable, however, the implication of what he said was calculated to transform [the defense witness] from a willing witness to one who would refuse to testify, and that in fact was the result. We therefore conclude that the prosecutor's remarks were prejudicial."); *In re Martin,* 44 *Cal.*3d 1, 241 *Cal.Rptr.* 263, 744 *P.*2d 374, 393 (1987) ("In order to establish a violation of his constitutional compulsory-process right, a defendant must demonstrate misconduct. To do so, he is not required to show that the governmental agent involved acted in bad faith or with improper motives."); *Diggs v. State,* 531 *N.E.*2d 461, 464 (Ind.1988) ("A prosecutor's warning of criminal charges during a personal interview with a witness improperly denies the defendant the use of that witness's testimony regardless of the prosecutor's intentions."), *cert. denied,* 490 *U.S.* 1038, 109 *S.Ct.* 1939, 104 *L.Ed.*2d 410 (1989); *State v. Finley,* 268 *Kan.* 557, 998 *P.*2d 95, 103–04 (2000) ("[T]he good faith of the State is irrelevant where the actions coerce a defense witness into asserting his or her right not to testify.").

government the option of granting immunity to the witness as an alternative to dismissal:

> At the new trial, in the event that the defendant calls [the witness] ..., if [the witness] invokes her Fifth Amendment right not to testify, a judgment of acquittal shall be entered unless the Government, pursuant to 18 *U.S.C.* §§ 6002, 6003, requests use immunity for her testimony.
> [*Ibid.*]

Likewise, in *People v. Shapiro*, the New York Court of Appeals reversed the defendant's conviction for promoting prostitution and other related offenses because of the prosecutor's "unveiled threats" to several "prospective" defense witnesses. 50 *N.Y.*2d 747, 431 *N.Y.S.*2d 422, 409 *N.E.*2d 897, 903–05 (1980). The prosecutor warned the witnesses that if they testified differently from their testimony in prior judicial proceedings, they would face perjury prosecutions. *Id.* at 902–04. Consequently, each witness refused to testify unless given immunity. *Id.* at 904. The "ultimate effect" of the prosecutor's warnings "was to deprive defendant of any direct witnesses to his side of the story." *Ibid.* The Court of Appeals held that it was improper for the prosecutor to insist in "menacing terms" that the witnesses be consistent with their previous testimony or face the penalty of perjury. *Id.* at 905. Moreover, the court determined that "the only way" to remove the resulting prejudice was "to require that the defendant's witnesses be granted immunity as a condition to subjecting the defendant to a new trial." *Id.* at 906 (citations omitted).

In *United States v. Hammond, supra,* the Fifth Circuit similarly held that prosecutorial threats to a defense witness, though couched in code words and not harshly conveyed, were sufficient to constitute a due process violation. 598 *F.*2d at 1012–13. In that case, a defense witness had been indicted on an unrelated matter in a different state. *Id.* at 1012. During a recess in the witness's testimony, a federal agent told him "that he knew about the 'situation in Colorado' " and "that if [the witness] 'continued on,' he would have 'nothing but trouble' in Colorado." *Ibid.* After receiving that warning, the witness refused to resume his testimony, telling the judge that he feared the "government would hurt

him in his Colorado trial." *Ibid.* To compound matters, another defense witness refused to testify after learning of the agent's threat. *Ibid.*

In reversing the conviction, the Court of Appeals observed that "it was certainly reasonable for [the defense witness] to interpret [the agent's] comments as threats to retaliate if [the witness] continued to testify." *Id.* at 1013. The court held that the agent's comments amounted to "substantial governmental interference" with the witness's "free and unhampered choice to testify" and therefore "deprived the defendant of his due process right to present his witnesses." *Ibid.* (internal quotations omitted). The court "could not conclude beyond a reasonable doubt that the defendant was not prejudiced by the due process violation." *Id.* at 1014.

In addition, a number of other jurisdictions have strongly condemned prosecutorial intimidation of defense witnesses.[8] Un-

---

[8] *See, e.g., United States v. Golding,* 168 *F.*3d 700, 702–03, 705 (4th Cir.1999) (vacating conviction, in part, because prosecutor told defendant's wife that if she testified, she would be prosecuted federally for previously dismissed state charge); *Vavages, supra,* 151 *F.*3d at 1188, 1193 (reversing conviction because prior to trial, "prosecutor warned [the witness's] attorney that he did not believe [the defendant's] alibi defense and that if [the witness] testified falsely, the government could bring perjury charges against her and withdraw from the plea agreement in [her] own criminal case"); *United States v. Schlei,* 122 *F.*3d 944, 991–93 (11th Cir.1997) (vacating conviction and remanding for evidentiary hearing to determine whether defense witness withheld exculpatory information due to prosecutorial threat of loss of immunity from prosecution), *cert. denied,* 523 *U.S.* 1077, 118 *S.Ct.* 1523, 140 *L.Ed.*2d 674 (1998); *United States v. Lord,* 711 *F.*2d 887, 891 (9th Cir.1983) (concluding that "defendant's due process right to a fair trial warrant[ed] further clarification" at evidentiary hearing to determine whether prosecutor told defense witness that decision to prosecute him would depend on his testimony); *United States v. MacCloskey,* 682 *F.*2d 468, 475, 479 (4th Cir.1982) (holding that "government's 'suggestion' destroyed the choice of [the witness] to testify freely" when prosecutor suggested to witness's attorney that "he would be well-advised to remind his client that, if she testified at [the defendant's] trial, she could be reindicted if she incriminated herself during that testimony"); *Martin, supra,* 241 *Cal.Rptr.* 263, 744 *P.*2d at 392 ("Governmental interference violative of a defendant's compulsory-process right includes, of course, the intimidation of defense witnesses by the prosecution."); *State v.*

derlying those federal and state cases is the notion that a prosecutor should not substantially interfere with a defense witness's decision to testify. *See Fort, supra,* 101 *N.J.* at 130, 501 *A.*2d 140.

### B.

██ We now apply those principles to this capital case. The State maintained at oral argument that it was "absolutely appropriate" for the assistant prosecutor to advise Sadlowski that he could be prosecuted for perjury or false swearing if he recanted his trial testimony. The State insisted that the prosecutor had an obligation to give that warning even though Sadlowski had an appointed attorney. The State proffered that without such a warning "the witness most likely could not be prosecuted for perjury." [9]

██ We disagree. The State has no affirmative duty to tell a witness, subpoenaed by the defense, that he could be prosecuted if his testimony is different from his previously sworn testimony and inconsistent with the State's theory of the case. We do not find that such warnings by the State are a pre-condition to a perjury or false swearing prosecution. In other words, a witness does not have to be told that if he testifies falsely he will be subject to prosecution.

---

*Williams,* 326 *S.C.* 130, 485 *S.E.*2d 99, 101 (1997) (reversing conviction when prosecutor told exculpatory witness's attorney that permitting defense counsel to interview witness would not be in "best interest" of witness, who then refused to be interviewed and did not testify at trial); *cf. United States v. Heller,* 830 *F.*2d 150, 152–54 (11th Cir.1987) (holding that IRS agent's intimidation of defendant's accountant induced him to provide false testimony against defendant, entitling defendant to new trial).

[9] Our Appellate Division has held that "a wilfully false certification in lieu of oath [under *Rule* 1:4–4] will support a criminal prosecution for false swearing." *State v. Kushner,* 192 *N.J.Super.* 583, 585, 471 *A.*2d 803 (App.Div.1984) (per curiam) (internal quotations omitted); *see also N.J.S.A.* 2C:28–2(a) ("A person who makes a false statement under oath or equivalent affirmation, or swears or affirms the truth of such a statement previously made, when he does not believe the statement to be true, is guilty of a crime of the fourth degree."). Sadlowski's certified statement was in the form required by *Rule* 1:4–4.

The State does not claim that Sadlowski misunderstood the transparent meaning of the prosecutor's message: if Sadlowski disowned his trial testimony there would be "considerations," *i.e.,* penal consequences. The PCR prosecutor did not deliver the message in the heavy-handed way of the trial judge in *Jamison, supra,* or in the repeated and overtly threatening way of the prosecutor in *Morrison, supra.* Here, the warning resembled the one in *Hammond, supra,* in which the FBI agent cautioned a defense witness under indictment that his continued testimony would bring him "nothing but trouble" and in *Shapiro, supra,* in which the prosecutor demanded that the witnesses hew to their previous statements. Whether the threat of a perjury prosecution is delivered conversationally, in transparently coded language, or loudly, in pointedly brash language, the effect is likely to be the same on the witness, even if the conduit is his attorney. The message to Sadlowski was clear enough. We accept for the purpose of this discussion that the PCR prosecutor acted in good faith. Even crediting the PCR prosecutor with the best possible motives, defendant nonetheless was deprived of his most essential witness at the PCR hearing.

One of the purposes of a trial is the search for truth. That pursuit is never more important than in a capital case when the stakes are life and death. Our jurisprudence has emphasized the heightened requirement of reliability that attaches to a death verdict. With that in mind, it is not the function of the State to save a defense witness from himself or to spare the court a supposed falsehood, at the expense of denying the court critical testimony.[10] To the extent possible, the PCR court was entitled to the testimony of every witness. The State may think that it alone

---

[10] We do not address the scenario in which the witness or his attorney initiates the discussion with the prosecutor and requests to know in advance the potential penal consequences that will follow from his testifying. A witness has a right to look after himself and make a reasoned decision weighing all the consequences. That said, a prosecutor must remember his obligation to do justice and not use

knows the truth, but it is for the court to decide the truth, after both sides have presented their cases. If falsehood is to be exposed, the State has a fair opportunity to do so on cross-examination.

The State did not present direct physical evidence tying defendant to the murder and relied substantially on defendant's own out-of-court admissions. Sadlowski's testimony was the centerpiece of the case. According to Sadlowski, defendant urged him to watch the news the evening of the murder of Keith Donaghy. At Sadlowski's apartment, while flipping channels on the television, defendant insisted that they check out a news report about the killing of a gas station attendant in Deptford Township. After the news, defendant repeatedly said, "I can't believe I did this shit." A short time later, as Sadlowski drove him home, defendant confessed, several times, that "he shot the guy" and blew "his brains all over the place." Although defendant revealed Sadlowski's plea deal with the State, Sadlowski's testimony nevertheless was devastating.

Sadlowski had alleged in his certified statement to defendant's attorney that he gave false testimony at defendant's trial as a result of promises of favorable treatment by an investigator and assistant prosecutor. Given the nature of Sadlowski's expected finger-pointing at the trial prosecutor and investigator, it was unseemly for the PCR prosecutor to issue a threat that had the effect of sealing Sadlowski's lips. The State, obviously, believed

his position as an "instrument[ ] of intimidation." *Shapiro, supra,* 431 *N.Y.S.*2d 422, 409 *N.E.*2d at 905; *see also Feaster I, supra,* 156 *N.J.* at 59, 716 *A.*2d 395. A trial is best served by the uninhibited flow of information to the fact finder. *See Jamison, supra,* 64 *N.J.* at 375–77, 316 *A.*2d 439. Our reading of the record in this case persuades us that the prosecutor was not responding to an inquiry from Sadlowski's attorney when she advised the attorney that there would be "considerations" if his client testified consistent with his certification. The State has never suggested otherwise to the PCR court or to this Court in its brief or during oral argument. However, if the State should allege a different sequence of events, then the PCR court should resolve that issue at the remand hearing. For a discussion of the remand hearing, see Part II.C., *infra* at 262–65, 877 *A.*2d at 245–47.

that Sadlowski had completed the crime of perjury or false swearing when he signed his sworn recantation. The PCR prosecutor had the authority to deal with any indication of false swearing "at the conclusion of the case as [she] might [have] deem[ed] warranted." *Jamison, supra,* 64 *N.J.* at 376, 316 *A.*2d 439. The prosecutor should have considered that the court was entitled "to the fullest disclosure of the relevant evidence ... before any solicitude for protection of the volunteering witness." *Id.* at 377, 316 *A.*2d 439.

That the PCR prosecutor may have acted in good faith to spare Sadlowski a second round of false swearing is not a valid basis for choking off the "free flow of evidence for the enlightenment" of the court. *Id.* at 376, 316 *A.*2d 439. Such an approach does not advance the truth-seeking function of a trial or a PCR hearing. We have confidence that our courts and juries are capable of detecting falsehoods with the aid of the adversarial process. The State can prosecute those who commit perjury or false swearing; the State simply cannot threaten a defense witness to keep him off the stand.

The annals of the criminal law are filled with countless examples of witnesses who have recanted their trial testimony, despite the potential jeopardy in which they have placed themselves. *See, e.g., State v. Ways,* 180 *N.J.* 171, 186–87, 850 *A.*2d 440 (2004); *State v. Carter,* 69 *N.J.* 420, 426–27, 354 *A.*2d 627 (1976); *State v. Puchalski,* 45 *N.J.* 97, 99–100, 211 *A.*2d 370 (1965). We do not share the dissent's absolute confidence that Sadlowski would have invoked the privilege regardless of the prosecutor's comments, *post* at 276, 877 *A.*2d at 255, which both the PCR court and the State acknowledged conveyed the threat of a possible perjury prosecution. We cannot know whether Sadlowski would have testified consistent with the contents of his certified statement under different circumstances. Like the courts in *Morrison, supra,* and *Shapiro, supra,* we will not speculate that the witness would have invoked his Fifth Amendment privilege regardless of the State's threat. We, therefore, must presume that the PCR prosecutor's threat made the witness unavailable to testify.

 We hold that the State may not use threats or intimidating tactics that substantially interfere with a witness's decision to testify for a defendant.[11] Such conduct, even if motivated by good faith, cannot be tolerated, particularly in a capital case. We conclude that defendant's due process and compulsory process rights were violated under our state constitution and that the outcome was not harmless to defendant.[12]

## C.

 Next, we consider the remedy. Defendant is entitled to a limited remand to the PCR court for the purpose of taking Sadlowski's testimony. Should Sadlowski continue to invoke his Fifth Amendment privilege, to the extent possible, the State must return defendant to the same position he held before the PCR prosecutor caused the witness to invoke the privilege. When the prosecution threatens a critical defense witness at trial, thereby securing his silence, one remedy is to reverse the defendant's conviction and to order the prosecutor either to grant immunity to the threatened witness at a new trial or face a dismissal. *United States v. Lord,* 711 *F.*2d 887, 891–92 (9th Cir.1983) (concluding that, on remand, "[i]f the district court finds such prosecutorial misconduct by a preponderance of the evidence, it should enter a judgment of acquittal for [the defendant] unless the prosecution ... ask[s] the district court to extend use immunity to [the defendant's witness] at a new trial" (footnote omitted)); *Morrison, supra,* 535 *F.*2d at 228–29 (granting motion for new trial and

---

[11] Defendant also argued that Sadlowski waived any right to invoke the Fifth Amendment privilege against self-incrimination after his testimonial withdrawal of his sworn certification at the PCR hearing. We need not reach that issue in light of our disposition of this case.

[12] Although the prosecutor's conduct in all likelihood violated the cognate provisions in the federal constitution, this Court's capital jurisprudence imposes heightened standards of reliability. We need not reach the federal question, having decided this case on an independent state ground.

ordering that "[a]t the new trial, in the event that the defendant calls [the woman threatened by the prosecution] as a witness, if she invokes her Fifth Amendment right not to testify, a judgment of acquittal shall be entered unless the Government ... requests use immunity for her testimony"); *Shapiro, supra,* 431 *N.Y.S.*2d 422, 409 *N.E.*2d at 906 (holding that "on a new trial, the only way in which the prejudice created by the prosecutor's threats can be dispelled would be to require that the defendant's witnesses be granted immunity as a condition to subjecting the defendant to a new trial").[13]

We need not go quite so far. In this case, a reversal is unwarranted because on the record before us, we cannot say that defendant did not receive a fair trial. We do hold, however, that defendant did not receive a fair PCR hearing because the prosecutor's conduct made Sadlowski unavailable as a defense witness.

■ Accordingly, the State will be given two options. First, the State may grant testimonial use immunity to Sadlowski at the remand PCR hearing if he renders himself unavailable to defen-

---

[13] *See also United States v. Angiulo,* 897 *F.*2d 1169, 1192 (1st Cir.) (noting that when prosecution "intimidate[s] or harass[es] potential defense witnesses to discourage them from testifying—for example, by threatening them with prosecution for perjury or other offenses" and witness consequently refuses to testify for defendant, "a court may order the prosecutor to grant immunity to the witness or face a judgment of acquittal"), *cert. denied,* 498 *U.S.* 845, 111 *S.Ct.* 130, 112 *L.Ed.*2d 98 (1990); *United States v. Patterson,* 819 *F.*2d 1495, 1506 (9th Cir.1987) (noting that "[i]f a prima facie showing of prosecutorial misconduct by preventing a defense witness from giving relevant testimony is shown, acquittal is required unless the prosecution requests immunity for the witness at a new trial"); *State v. Nessim,* 587 *So.*2d 1344, 1345–46 (Fla.Dist.Ct.App.1991) (noting that prosecutor must either grant defense witness immunity or dismiss case when State's confidential informant had allegedly destroyed exculpatory audiotapes and defendant's "only remaining witness" refused to testify without immunity because prosecutor allegedly "instructed" him not to be witness for defendant); *State v. Carlisle,* 73 *Wash.App.* 678, 871 *P.*2d 174, 176 (1994) ("[I]f the court finds that prosecutorial misconduct intimidated a witness into not testifying for the defense, the defendant is denied the right to compulsory process, and hence due process. Dismissal is required at a new trial unless the prosecutor requests use immunity for the witness.").

dant by invoking the privilege. The grant of immunity is not a license to commit perjury and would not protect Sadlowski if he swore falsely at the hearing. *See N.J.S.A.* 2A:81–17.3; *State v. Carminati,* 170 *N.J.Super.* 1, 14, 405 *A.2d* 456 (App.Div.1979) (observing that immunized "testimony can ... be used as the basis for a charge of perjury or false swearing"). However, under a grant of use immunity, Sadlowski's testimony could not be used to prove a *past* offense. At the hearing, the PCR court would proceed in the ordinary course, consider all the evidence (including any rebuttal evidence offered by the State), and determine what weight, if any, to give Sadlowski's testimony. *See Carter, supra,* 69 *N.J.* at 427, 354 *A.2d* 627 (observing that our "[c]ourts generally regard recantation testimony as suspect and untrustworthy").[14] The court then would decide whether defendant is entitled to a new trial based on newly discovered evidence under the standard set forth in *Ways, supra,* 180 *N.J.* at 187–89, 850 *A.2d* 440. We do not presume a particular outcome.

We will not compel the State to grant Sadlowski testimonial immunity. If it does not, however, the second option will come into play. We will direct the PCR court to disregard Sadlowski's trial testimony in full. The PCR court next must determine whether the absence of Sadlowski's trial testimony "would have the probable effect of raising a reasonable doubt as to the defendant's guilt" in the minds of the jury. *Id.* at 189, 850 *A.2d* 440. If the answer to that question is yes, defendant will receive a new trial. If the answer is no, we will review this issue along with the other remaining issues on appeal.

### III.

For the reasons discussed, we hold that the State substantially interfered with Michael Sadlowski's decision to testify in violation

---

14 As noted, recantation testimony is "a species of newly discovered evidence generally regarded as suspect and untrustworthy." *Ways, supra,* 180 *N.J.* at 196–97, 850 *A.2d* 440 (internal quotations omitted). "[T]he burden of proof rests on those presenting such testimony to establish that it is probably true and the trial testimony probably false." *Carter, supra,* 69 *N.J.* at 427, 354 *A.2d* 627.

of defendant's rights to due process and compulsory process under the New Jersey Constitution. Accordingly, we remand to the PCR court for a hearing consistent with this opinion, and retain jurisdiction.

Justice RIVERA–SOTO, dissenting.

In this appeal we focus on the denial of post-conviction relief (PCR) to defendant Richard Feaster who, in 1993 and with a shotgun at close range, executed an innocent gas station attendant for the paltry sum of $191.72. After a six-day PCR hearing that consumed more than 1,000 pages of transcripts, the PCR court issued a comprehensive and exhaustive oral opinion rejecting more than twenty assignments of error. In our review of the PCR court's denial of relief, we have focused exclusively·on defendant's attempt to have one of the witnesses who testified against him at trial, Michael Sadlowski, recant his trial testimony. Sadlowski, who testified and was cross-examined in detail at defendant's capital murder trial, recanted his trial testimony in a written statement when he was visited in prison by defendant's counsel and, more to the point, when Sadlowski was without the benefit of counsel. Once brought from his prison cell to defendant's PCR hearing pursuant to a writ, Sadlowski requested that counsel be appointed to represent him,[1] a request the PCR court granted. After discussions between the prosecutor and Sadlowski's counsel and later separate discussions between Sadlowski and his own counsel, Sadlowski's counsel advised the PCR court that Sadlowski withdrew his recantation so as to take advantage of the statutory affirmative defense to a perjury prosecution available to those who retract a false statement "in the course of the proceeding or matter in which it was made prior to the termination of the proceeding or matter without having caused irreparable harm to

---

[1] I assign neither significance nor praise to the fact that it was defendant's PCR counsel who only then advised the Court that Sadlowski wished to have counsel assigned to him. Once aware of the circumstances, I brook no doubt that the PCR court sua sponte would have assigned counsel to Sadlowski.

any party." *N.J.S.A.* 2C:28–1d. Sadlowski's counsel also advised the PCR court that Sadlowski would assert the privilege against self-incrimination at the PCR hearing. The PCR court permitted the retraction and accepted Sadlowski's assertion of the privilege against self-incrimination.

The majority today correctly reaffirms the role of trials as a "search for truth," *ante,* 184 *N.J.* at 251, 877 *A.*2d at 239. However, in doing so, it foists on the State a needlessly harsh Hobson's choice: either grant a witness use and derivative use immunity or suffer the suppression of that witness' trial testimony. Because the majority's analysis concerning the import and effect of Sadlowski's recantation and the withdrawal of his recantation is flawed factually, procedurally, legally and as to its remedy, I respectfully dissent.

## I.

### A.

One need not dwell on the facts supporting defendant's conviction and sentence; these are exhaustively set forth in our earlier affirmance. *State v. Feaster,* 156 *N.J.* 1, 716 *A.*2d 395 (1998) (*Feaster* I), *cert. denied,* 532 *U.S.* 932, 121 *S.Ct.* 1380, 149 *L.Ed.*2d 306 (2001). It is sufficient to note that, "[t]he primary defense strategy was characterized by a sustained attack on the credibility of key State witnesses." *Feaster* I, *supra,* 156 *N.J.* at 27, 716 *A.*2d 395. With particular regard to Sadlowski,

> the defense highlighted Sadlowski's use of drugs and alcohol, and elicited on cross-examination his admission that he was "hammered" on the night of the murder. He testified that he did not hear defendant's incriminating statement allegedly made near the pool table at the Columbia Cafe; Sadlowski also did not recall Shiplee's accusation made against defendant back at the apartment. The defense also stressed the consideration Sadlowski received from the State for his testimony, and the discrepancies in the three separate statements he had given to authorities.
> [*Id.* at 28, 716 *A.*2d 395.]

Based on all of the evidence presented, defendant was convicted of "purposeful-or-knowing murder by his own conduct, *N.J.S.A.* 2C:11–3a(1) and/or (2); felony murder, *N.J.S.A.* 2C:11–3a(3); con-

spiracy to commit murder, *N.J.S.A.* 2C:5–2; first-degree robbery, *N.J.S.A.* 2C:15–1; conspiracy to commit armed robbery, *N.J.S.A.* 2C:5–2; possession of a weapon for an unlawful purpose, *N.J.S.A.* 2C:39–4a; and possession of a sawed-off shotgun, *N.J.S.A.* 2C:39–3b," and was sentenced to death. *Feaster* I, *supra*, 156 *N.J.* at 17, 716 *A.*2d 395. On direct appeal as of right to this Court, we affirmed defendant's conviction and sentence. *Ibid.* As part of that appeal, defendant requested proportionality review for his death sentence pursuant to *N.J.S.A.* 2C:11–3e. *Id.* at 93, 716 *A.*2d 395. That review was granted and we found "no disproportionality in defendant's sentence of death." *State v. Feaster*, 165 *N.J.* 388, 393, 757 *A.*2d 266 (2000) (*Feaster* II), *cert. denied*, 532 *U.S.* 932, 121 *S.Ct.* 1380, 149 *L.Ed.*2d 306 (2001).

On March 19, 2001, the Supreme Court of the United States denies defendant's petition for a writ of *certiorari.* On March 26, 2001, defendant filed a timely petition for post-conviction relief under *R.* 3:22–1 to –12,[2] originally listing twenty-two assignments of error in the conduct of his trial.[3] In preparation for the hearing on defendant's petition for post-conviction relief, on July 10, 2001, defendant's PCR counsel sought to interview Sadlowski. That interview resulted in a recantation statement, which was hand-written by defendant's PCR counsel, purportedly signed by Sadlowski, and is set forth at length in the majority opinion, *ante*, 184 *N.J.* at 245, 877 *A.*2d at 235. On April 8, 2002, almost nine months after securing Sadlowski's written recantation and almost one year after filing his original petition for post-conviction relief, defendant filed a motion for a new trial based on newly discovered

---

[2] Under *R.* 3:22–12(b), "[i]n cases in which the death penalty has been imposed, defendant's petition for post-conviction relief must be filed within thirty days of the denial of *certiorari* or other final action by the United States Supreme Court in respect of defendant's direct appeal."

[3] By a supplemental submission, the absolute number of defendant's issues increased. However, because of significant overlap, it is not altogether clear whether these added issues actually increased the tally of defendant's substantive assignments of error. It is sufficient to note that defendant's initial petition for post-conviction relief, including exhibits, totaled 156 pages.

evidence pursuant to *R.* 3:20–2, which provides that "[a] motion for a new trial based on the ground of newly discovered evidence may be made at any time."[4]

· The substance of Sadlowski's recantation statement, as well as the manner in which it was secured, form the basis of the dispute here. Because the substance of Sadlowski's recantation is set forth within its four corners, it requires no further explanation. The manner in which that recantation was secured, however, does call for closer analysis. Millee Gutierrez, a senior investigator from the Office of the Public Defender assigned to assist in defendant's petition for post-conviction relief, was asked to locate Sadlowski, who was then an inmate at Bayside State Prison. Gutierrez and one of defendant's PCR counsel went to interview Sadlowski. Gutierrez explained what happened:

Q. At some point in the interview he agreed to give us a written statement to what he had told us?

A. Yes.

Q. I then borrowed a pad from you, a public defender pad?

A. Yes.

Q. I wrote, essentially, what Mr. Sadlowski was telling me down on the pad?

A. Yes.

Q. Mr. Sadlowski went over it and read it?

A. Yes, he did.

Q. We asked him to sign it?

A. Yes.

Q. He signed it of his own free will?

A. Yes, he did.

Q. Let me ask you to turn to the final page of D–70 [the written recantation], ask you if you see the signature of Mr. Sadlowski?

---

[4] There is no explanation in the record for the nine month delay between defendant securing Sadlowski's recantation and the filing of his motion for a new trial based on that recantation. Without dwelling on the obviously tactical reasons for that delay, the salient fact here is that defendant himself recognized that an attempt to raise Sadlowski's recantation as newly discovered evidence within the context of his petition for post-conviction would have been time-barred and, hence, defendant selected the only procedural vehicle available to him: a motion for a new trial.

A. Yes, I do.

Q. Did you then witness that signature?

A. Yes, I did.

Q. Did anybody twist his arm to give this statement?

A. No.

Q. He gave it willingly?

A. Yes, he did.

Q. Told us it was the truth, correct?

A. Yes.

Gutierrez then testified that, during a later interview, Sadlowski reaffirmed his recantation:

Q. Yes, by the way, did we note you had a further interview of Mr. Sadlowski about a year later?

A. Yes.

Q. At which time myself, [another of defendant's PCR counsel], and you met again with Mr. Sadlowski?

A. Yes.

Q. At Bayside?

A. Yes.

Q. Did he then say anything about this statement?

A. No. He said that he stood by it.

As the prosecution noted in its cross-examination of Gutierrez, neither of these two interviews of Sadlowski were tape-recorded.

Acknowledging that Sadlowski's retraction of his sworn trial testimony would expose him to a prosecution for perjury, the PCR court inquired directly of defendant's PCR counsel "whether anybody advise[d] Mr. Sadlowski of the fact that he might be placed in jeopardy." Defendant's PCR counsel responded:

I can make representations about that. That is that that subject did come in. We informed Mr. Sadlowski that we couldn't give him legal advise. It he wanted to see counsel before he gave us any statement, then that was his privilege. He did not want to do so.

He fully understood that, obviously, it was inconsistent with his trial testimony. He recognized the fact that that might put him in some form of legal jeopardy. Nevertheless, he wanted to give the [statement].

We didn't undertake to advise him legally. We specifically told him that that's at odds with what our representation of the defendant is.[5]

Immediately on the heels of those representations, the PCR court noted that "[g]iven the representation, the first time [Sadlowski] had [legal] representation he exercised his privilege [against self-incrimination,]" and ultimately held that, "[w]hen [Sadlowski] got to court this past summer the first thing he did when he was called upon to testify was ask for an attorney." (emphasis supplied).[6]

When Sadlowski was called to testify after he was represented by counsel, his counsel informed the PCR court that "Mr. Sadlowski [was] going to invoke his Fifth Amendment privilege to any and all questions that might be asked of him[,]" and that "[i]n addition, pursuant to *N.J.S.A.* 2C:28–2(d) [sic], any statement that

---

[5] I express no view on the propriety of the procedure employed by defendant's PCR counsel in securing the recantation statement from Sadlowski. Suffice it to note that, had this attempt been made in the setting of a civil lawsuit, counsel would have been obliged, as a matter of professional ethics, to make certain both that Sadlowski understood that counsel was interested in the outcome and that Sadlowski did not misunderstand counsel's role. *R.P.C.* 4.3. This obligation is underscored further by contrasting Sadlowski's interview with the interview of a corporate employee who may be part of "control group" in connection with a civil lawsuit; that latter setting clearly requires the presence of counsel. *In re Opinion 668 of the Advisory Committee on Professional Ethics*, 134 *N.J.* 294, 633 A.2d 959 (1993). Similarly, in a purely civil context, recently "[w]e stress[ed] that while a commercial party does not have to act with benevolence towards an opposing party, it cannot behave inequitably." *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 182 *N.J.* 210, 231, 864 A.2d 387 (2005) (footnote omitted). I see no principled reason those requirements should not apply with equal force here.

By way of contrast, had the roles been reversed and the questioning of Sadlowski been carried out by agents of the State, we likely would have required that the statement be preceded by the explanation and waiver of Sadlowski's rights under *Miranda v. Arizona*, 384 *U.S.* 436, 86 *S.Ct.* 1602, 16 *L.Ed.*2d 694 (1966): that Sadlowski had the right to remain silent; that if he surrendered that right, what he said could be used against him; that he had a right to have counsel present during either of those interviews; and that if he could not afford counsel, counsel could be appointed free of charge.

[6] *See* footnote 1, *supra*, 184 *N.J.* 265, 877 A.2d at 247.

[ ] has been proferred to this Court is withdrawn and retracted."
A verbal skirmish then ensued, with defendant's PCR counsel
insisting that only Sadlowski himself could withdraw his recanta-
tion and, therefore, Sadlowski would have to testify, at least to
that limited extent. After the PCR court agreed to limit Sadlow-
ski's testimony to the withdrawal of his recantation and his
assertion of his privilege against self-incrimination, Sadlowski,
questioned by his own counsel, testified as follows:

Q. Mr. Sadlowski, Michael—

A. Yeah.

Q. —did you have the opportunity to speak with me concerning your state-
ment?

A. Yeah.

Q. Did you make a request to me to withdraw that statement on the record?

A. Yeah.

Q. Is it your desire, then, to retract, withdraw that statement, is that correct,
sir?

A. Yes.

Q. *Did anybody force you, threaten you to withdraw this statement?*

A. *No.*

[(emphasis supplied).]

Defendants PCR counsel did not contemporaneously object to
this line of questioning or the procedure that was followed.[7]
Instead, it was only after Sadlowski's withdrawal of his recanta-
tion and assertion of his Fifth Amendment privilege were com-
plete that defendants PCR counsel sought to have the PCR court
require that Sadlowski continue testifying, despite Sadlowski's
now twice asserted privilege against self-incrimination. Defen-
dants PCR counsel argued that defendants interest must have

---

[7] Not only was there no contemporaneous objection to the procedure that
allowed Sadlowski to be questioned by his own counsel, there was no objection
to that procedure raised in this appeal. For those reasons, there is no basis for
the conclusion that "the PCR judge never should have permitted [Sadlowski's
counsel], an attorney who did not represent a party in the case, to question a
defense witness[,]" *ante,* 184 *N.J.* 248, 877 *A.*2d at 237, or that the PCR court
"then compounded that error by accepting Sadlowski's testimony after he
invoked the privilege as a shield against cross-examination." *Id.* at 249, 877
*A.*2d at 238.

primacy because defendant awaits execution and, hence, anyone else's privileges must give way to defendants needs. The PCR court rejected that notion, correctly observing that "I cant go picking and choosing whose rights I'm going to violate because one has a more permanent alternative than the other. That cant be."

Defendants PCR counsel then commenced the inquiry on which the majority grounds our review:

[DEFENSE COUNSEL]: Judge, in that [vein], may we inquire as to whether or not there's been a threat of prosecution by the Gloucester County Prosecutors Office?

THE COURT: I don't think it matters. I don't think it matters. If he is aware that he is in criminal jeopardy, he doesn't have to wait until he is prosecuted to invoke his right.

[DEFENSE COUNSEL]: My question is different than that. Its not whether or not he just has an apprehension of prosecution, but whether or not he's been actively advised that he will be prosecuted.

THE COURT: I don't think its relevant. You have to ask someone else that question. Obviously, this witness is not going to testify to that.

[DEFENSE COUNSEL]: If we might, can we get a representation from the state as to whether or not such a bit of [advice] has been given to Mr. Sadlowski or his counsel?

[PROSECUTOR]: Judge, when I talked to—when I talked to [Sadlowski's counsel] I gave him [Sadlowski's] statement and I said this is his statement. If he testifies the way he does, then there are considerations. That's all I said. Then [Sadlowski's counsel] took that statement and talked to his client. I don't know what he told him. So, there is no threat.

THE COURT: Nor should you know what [Sadlowski's counsel] discussed with his client.

[DEFENSE COUNSEL]: I'm taking the assistant prosecutors representations that there are considerations to mean that the inference was that should he testify pursuant to the affidavit he would be prosecuted. That's all I'm looking for, Judge.

[PROSECUTOR]: That's what I said.

THE COURT: I don't know what that means, but.

[DEFENSE COUNSEL]: Just to pin it down, Judge, that in conversation with the witness, counsel, prior to his testimony, the assistant prosecutor advised him that should Mr. Sadlowski testify pursuant to his affidavit or certification he'd be prosecuted for perjury. I think we should have that spread on the record.

[PROSECUTOR]: That's not what I said. There are considerations.

THE COURT: That wasn't what I heard.

[DEFENSE COUNSEL]: I'm trying to get at what that means, there are considerations.

THE COURT: It may sound mysterious. If you want to call this gentleman as a witness to determine what it was, maybe that's another recourse. With respect to this particular witness, he invoked his rights, withdrawn his statement. You can argue what the implications of that are if you like, but I'm not going to require him to participate anymore.

[DEFENSE COUNSEL]: I don't think we need his participation for that.

THE COURT: He being Mr. Sadlowski.

[DEFENSE COUNSEL]: Ill accept [the prosecutors] general representations. I don't feel I need to place her on the stand under oath. I want to understand here today, correct me if I'm wrong, that the representation was made, inferentially or otherwise, to Mr. Sadlowski's attorney that should he testify in accordance with his affidavit the prosecutor would consider prosecuting him for perjury.

THE COURT: I'm not sure that that was said. I want to be fair to the record, I want to be fair to everyone else. [Sadlowski's counsel] is an experienced counsel. I don't think he needs [the prosecutors] suggestion as to anything, nor would he wait for it.

Let me not speak for you, [Sadlowski's counsel], to advise his client in accordance with what his jeopardy might be.

Rejecting the suggestion advanced by defendants PCR counsel that the State grant Sadlowski immunity, the prosecutor made clear that "[t]here was nothing that I said to [Sadlowski's counsel] to strongarm him into telling his client. That conversation was probably a two-second conversation. Absolutely nothing from the state that was inappropriate as to what I said to [Sadlowski's counsel]." The PCR court then noted the quandary in which Sadlowski had been placed, observing that

[i]t seems to me the witness [Sadlowski], it may be you [defendants PCR counsel] in obtaining the statement, somebody has placed this witness in jeopardy. I don't know who it was, but somebody placed him in jeopardy. Whether you knew about it or whether, I assume, he signed this document, whether or not he knew that is another matter.

Six days later, at the continued hearing date, defendants PCR counsel ultimately moved "to compel the continued testimony of witness Michael Sadlowski." Relying on *State v. DeCola*, 33 *N.J.* 335, 164 *A.*2d 729 (1960), defendants PCR counsel urged that the PCR court examine the basis of Sadlowski's assertion of the privilege against self-incrimination before ruling whether Sadlow-

ski would be required to testify further. The PCR court rejected this end-run:

> I'm satisfied that the defense is attempting to do indirectly what it cant do directly, that is, require Mr. Sadlowski to testify over his invoking his privilege to remain silent. He was advised by counsel.
>
> I suspect at the [ ] moment he arrives and I have him start making statements about why he doesn't want to give his statement [of retraction], or you want to cross-examine him on that issue, the problem will become even broader.
>
> It appears on its face he invoked his privilege. I think its clear on its face as to why he invoked his privilege. With respect to his subjection to a possible perjury charge, his counsel invoked it. His counsel insisted that he wished to not only invoke the privilege, but withdraw the statement from consideration.
>
> Pursuant to the statute, that being the case, I don't have to require Mr. Sadlowski to testify at this proceeding. So I'm going to deny the application.

In a thoughtful, forty-one page oral opinion, the PCR court denied defendants petition for post-conviction relief as well as his motion for a new trial. With respect to defendants motion for a new trial on the issue of Sadlowski's recantation and the withdrawal of his recantation, the PCR court made the following specific findings:

> Sometime in 2001 when post-conviction relief was first filed, the defense counsel visited Mr. [Sadlowski] in jail, spoke to him, and obtained from him a statement, which I included and attach for the record because I want a reviewing court to have its availability; although I did not consider it in my findings. He made a statement saying that his original statements at trial were not true.
>
> When he got to court—it was signed by an investigator. *When he got to court this past summer the first thing he did when he was called upon to testify was ask for an attorney.* This is a witness who already [is] spending time in jail asking for an attorney. Which leads the Court to the inescapable conclusion that *this witness[ ] knew he had some criminal exposure, knew he had problems. So he wanted an attorney to discuss it.*
>
> The Court granted a postponement with respect to his testimony, allowing counsel to contact him. He was contacted and interviewed by extremely competent counsel, whose reputation in this county, in South Jersey as well, [is] well known in criminal courts. And at the time he was represented for testimony he relied upon his Fifth Amendment Privilege.
>
> . . . .
>
> Mr. Sadlowski's appointed counsel then indicated that he wished to withdraw that [recantation] pursuant to statute so that he would not be exposing himself to any criminal jeopardy because of the existence of that statement recanting his original testimony.

Counsel objected to that, requesting the Court to give limited immunity to the defendant so that he could [give] testimony with respect to that recantation. That was a specific circumstance involving Mr. Sadlowski. The implications, however, [of] that argument, in thinking about it further, just seem to me to be so broad and overpowering that it would invite testimony at a trial, and any time thereafter anybody can come in under a grant of immunity to say anything they wanted. Which means that the original testimony, basically, is worthless. Its worthless as a means of allowing the state to utilize witnesses and plea offers in exchange for testimony, because it would insulate that person, once they completed their obligation, from any liability to merely recant later on, thereby throwing the entire system into a state of chaotic disarray.

In this particular instance, however, *having consulted with counsel, this witness[ ] knew he had a problem once he appeared in court, having given that original recanting statement.*

The prosecutor indicated that if the [witness] did in fact testify there were going to be some considerations. Clearly, *the considerations that the prosecutor was [alluding] to was the possibility of perjury charges, of which this witness knew before the prosecutor—weeks before the prosecutor even said that, because he asked for an attorney from the get-go.* Obviously implying, or inferring, that he knew that there were going to be considerations with respect to his different testimony, his recanting statement and the original testimony.[8]

Defense counsel made much of the fact that the prosecutor had suggested considerations, implying that there was something improper about the prosecutor suggesting that there would be charges brought or hinting at it. I'm not sure it was ever actually said. I certainly got the import of the implication. And I suspect the witness got it as well. *But it should have been obvious on its face that that was a natural course once the witness testified contrary to the original trial testimony.*

That, again, did not raise any particular problem. Mr. Sadlowski is a state prisoner. His motivations for wanting to execute a recanting statement could be legion. I don't think that impacted on this petitioners rights in any fashion. That was a decision made by a witness to protect himself. I think he had a right to protect himself. I think he took steps to protect himself. In further consideration his motivation would have exposed him to further criminal liability.

Counsel at one point suggested that I weigh the seriousness of his exposure to the petitioners exposure. I think I suggested on the record at that point that that

---

8 The chronology of events is clear: counsel was appointed to represent Sadlowski, that assigned counsel then met with the prosecutor—when the prosecutor provided a copy of Sadlowski's recantation to assigned counsel and when the "there will be considerations" statement was made—and later assigned counsel met with Sadlowski. Because we must encourage fairness in communication among counsel, *R.P.C.* 3.4, I cannot subscribe to a process that reduces discussion among counsel to secretive winks and nods on pain of an allegation of interference.

would be an improper consideration for me to make since everyone's rights had to be determined in their own context.

Having said that, I don't think that the existence of that note of recantation plays an impact, plays a role in these proceedings in any fashion. They were withdrawn properly pursuant to the statute. I'm satisfied that the Court need give no further consideration to that issue.

[(emphasis supplied).]

This appeal followed.

### B.

The tenor and flavor of the proceedings before the PCR court were fundamentally different from the description provided by the majority. The conclusion that "the prosecutor substantially interfered with Sadlowski's decision to testify and, therefore, denied defendant a witness who might have supported his claim that he was wrongly convicted and sentenced to death[,]" *ante,* 184 *N.J.* at 240, 877 *A.*2d at 232, stands in stark contrast with Sadlowski's decision, on the advice of his own counsel and without influence by the prosecutor, to withdraw his recantation—thereby taking advantage of the safe harbor against perjury prosecutions provided by *N.J.S.A.* 2C:28–1d—and assert his privilege against self-incrimination.

In this context, it also must be noted that the procedural posture described by the majority, that this issue is cognizable as part of an appeal from a denial of post-conviction relief. is incorrect. As noted, defendants application concerning Sadlowski's recantation was made in the context of a motion for a new trial based on newly discovered evidence,[9] and *not* a petition for post-conviction relief. The well-established standard for relief on a motion for a new trial based on newly discovered evidence is that

the new evidence must be (1) material to the issue and not merely cumulative or impeaching or contradictory; (2) discovered since the trial and not discoverable by reasonable diligence beforehand; and (3) of the sort that would probably change

---

[9] Indeed, had defendant filed his motion for a new trial on any basis other than newly discovered evidence, it would have been time-barred. *R.* 3:20–2.

the jury's verdict if a new trial were granted. *All three tests must be met before the evidence can be said to justify a new trial.*
[*State v. Carter*, 85 *N.J.* 300, 314, 426 *A.*2d 501 (1981) (citations omitted) (emphasis supplied).]

That Sadlowski's post-trial recantation is nothing more than "impeaching or contradictory" to his trial testimony brooks no argument and, hence, cannot meet the first and threshold test in the determination of whether new evidence is "newly-discovered evidence" sufficient to justify a new trial. *See ibid.* It is precisely because of the "more stringent" test we apply for "newly discovered evidence," *ibid.*, as the majority correctly acknowledges,[10] *ante,* 184 *N.J.* at 264–65, 877 *A.*2d at 247, that we "generally regard recantation testimony as suspect and untrustworthy [and c]onsequently, the burden of proof rests on those presenting such testimony to establish that is it probably true and the trial testimony probably false." *State v. Carter,* 69 *N.J.* 420, 427, 354 *A.*2d 627 (1976) (citations omitted). We have consistently held that

[t]he test for the judge in evaluating a recantation upon a motion for a new trial is whether it casts serious doubt upon the truth of the testimony given at the trial and whether, if believable, the factual recital of the recantation so seriously impugns the entire trial evidence as to give rise to the conclusion that there resulted a possible miscarriage of justice. His first duty is, therefore, to determine whether the recanting statement is believable.
[*Ibid.* (citing *State v. Puchalski,* 45 *N.J.* 97, 107–08, 211 *A.*2d 370 (1965)).]

The PCR court found that Sadlowski's "motivations for wanting to execute a recantation could be legion." That finding, coupled with the PCR courts rejection of Sadlowski's recantation as a whole, leads to the conclusion that the PCR court did not find Sadlowski's recantation believable. Our inquiry should proceed no further.

That result does not change even if one considers this application within the context of a petition for post-conviction relief. We

---

[10] Albeit, by its reference to *State v. Ways,* 180 *N.J.* 171, 187–89, 850 *A.*2d 440 (2004), the majority acknowledges this difference only within the context of a petition for post-conviction relief, and not within its more proper context here as a motion for a new trial based on newly discovered evidence.

recently held that, while "we are not bound by and give no deference to the legal conclusions of the PCR court[,] . . . we give deference to the trial courts factual findings . . . when supported by adequate, substantial and credible evidence." *State v. Harris*, 181 *N.J.* 391, 415, 859 *A.2d* 364 (2004) (citations and internal quotation marks omitted). The uncontroverted facts are that the State neither threatened nor forced Sadlowski to withdraw his recantation: in response to the direct question "Did anybody force you, threaten you to withdraw this statement?," Sadlowski's response was a straightforward and unequivocal "No." Coupling Sadlowski's response with the uncontested finding that Sadlowski's recantation withdrawal was the product of his own concerns and discussions with his counsel, the conclusion that Sadlowski acted as a result of some form of blameworthy prosecutorial interference simply crumbles.

Regardless of whether viewed as a motion for a new trial based on newly discovered evidence or as a petition for post-conviction relief, the construct founded on the claim that "the prosecutor substantially interfered with Sadlowski's decision to testify" simply is without basis in this record. For that reason, the decision today is, at its core, flawed.

## II.

### A.

When subjected to scrutiny, the majority's legal analysis fares no better. According to the majority, because "the prosecutor substantially interfered with Sadlowski's decision to testify," we must fashion a legal remedy for this perceived wrong. According to the majority, the remedy is straightforward: the prosecution may either grant immunity to Sadlowski and allow him to testify to his hearts content, or suffer the pain of having the PCR court strike Sadlowski's trial testimony in its reconsideration of defendants petition for post-conviction relief and motion for a new trial. *Ante*, 184 *N.J.* at 264–65, 877 *A.2d* at 247.

No New Jersey precedent stands for the proposition that prosecutorial interference with a witness testimony warrants a grant of immunity. In fact, every decision relied on by the majority arose within the context of prosecutorial *misconduct* during a trial on the merits and then only as a remedy of last resort, and not in the context of a post-trial motion for a new trial. *See United States v. Golding,* 168 *F.*3d 700 (4th Cir.1999); *United States v. Vavages,* 151 *F.*3d 1185 (9th Cir.1998); *United States v. Lord,* 711 *F.*2d 887 (9th Cir.1983); *United States v. Morrison,* 535 *F.*2d 223 (3rd Cir.1976); *United States v. Thomas,* 488 *F.*2d 334 (6th Cir.1973); *State v. Nessim,* 587 *So.*2d 1344 (Fla.Dist.Ct.App.1991); *People v. Shapiro,* 50 *N.Y.*2d 747, 431 *N.Y.S.*2d 422, 409 *N.E.2d* 897 (1980). Although the majority characterizes the prosecutors actions here as "unseemly," *ante,* 184 *N.J.* at 260, 877 *A.*2d at 244, it tacitly concedes the point when it acknowledges that "the PCR prosecutor may have acted in good faith." *Id.* at 261, 877 *A.*2d at 245. Yet, to reach its ultimate conclusion, the majority must cast that notion aside because, absent a finding that there was prosecutorial misconduct here, a necessary condition precedent to relief even under the majority's construct, the majority's conclusion cannot be justified. More to the point, any suggestion that the majority is simply applying a universally accepted precept that mandates an immunity grant must be dispelled for that, too, is in error. *See, e.g., United States v. Simmons,* 699 *F.*2d 1250 (D.C.Cir.), *cert. denied,* 464 *U.S.* 835, 104 *S.Ct.* 121, 78 *L.Ed.*2d 119 (1983).

There was no sustainable allegation of prosecutorial misconduct in this case. Defendant had the due process benefit of a lengthy and exhaustive trial during which Sadlowski testified and was cross-examined vigorously and without reservation by experienced trial counsel.[11] That trial was reviewed exhaustively by this Court

---

11 As described in the biography of defendant's trial counsel prepared by his law firm and made part of the State's appendix, defendant's trial counsel is highly experienced and respected; a former "assistant prosecutor in the Office of the Camden County Prosecutor" and the former "Assistant Trial Chief and Career Criminal Prosecutor in the Office of the Cumberland County Prosecutor,

on direct appeal and, in two separate comprehensive opinions, defendants conviction and sentence were sustained and his penalty was found to be proportionate. Defendant sought review from the Supreme Court of the United States, which also was denied. Now, and only in the context of his motion for a new trial based on newly discovered evidence, defendant claims that somehow his original conviction was tainted because, once Sadlowski had the benefit of independent counsel, he withdrew an uncounseled recantation of his trial testimony eight years after the trial testimony was given.

What defendant peddles here is the proverbial worthless bill of goods. Defendant, through his counsel, persuaded Sadlowski, an incarcerated and uncounselled state prisoner, to recant his trial testimony. When Sadlowski realized the position in which defendant had placed him—a realization that occurred weeks *before* the prosecutor made any reference to "considerations" in a discussion with Sadlowski's counsel—Sadlowski sought and received the advice of counsel. Based on that advice, Sadlowski withdrew his recantation and invoked his privilege against self-incrimination. The PCR court had it right: allowing a witness to negotiate a deal with the prosecution in exchange for testimony against another and then to recant that testimony with impunity is plainly irresponsible and would "throw[ ] the entire system into a state of chaotic disarray." That is behavior no ordered system of justice can allow.

where he supervised litigation[;]" has "defended 8 capital murder cases, trying 5 of them to completion[;] has defended criminal RICO cases in State and Federal Court[; and] has extensive trial experience in defending white-collar crime, computer sabotage, grand jury investigations, and complex civil litigation." That biography also notes that defendant's trial counsel is a "Trustee of the Association of Criminal Defense Lawyers of New Jersey, a member of the Camden County Criminal Practice Committee, and a lecturer for the Institut[e] of Continuing Legal Education of New Jersey." Although defendant's petition for post-conviction relief asserted ineffective assistance of counsel claims, *see* *Strickland v. Washington,* 466 *U.S.* 668, 104 *S.Ct.* 2052, 80 *L.Ed.*2d 674 (1984); *State v. Fritz,* 105 *N.J.* 42, 519 *A.2d* 336 (1987), inexplicably defendant's trial counsel was never called to testify at the PCR hearing.

### B.

Even if one were to assume that there is factual support in this record for the result the majority reaches, that there is no procedural impediment to applying the legal standard the majority advances, and that the PCR court erred in refusing to consider Sadlowski's testimony or require that he be immunized, Sadlowski's recantation and withdrawal nonetheless must be reviewed through the prism of harmless error. At trial, "[a]ny error or omission that does not prejudice a substantial right shall be disregarded." *R.* 1:7–5. In contrast, on appeal, "[a]ny error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result." *R.* 2:10–2; *see also State v. Spruell,* 121 *N.J.* 32, 42, 577 *A.*2d 821 (1990).

There can be no doubt that, even had the prosecutor overtly threatened Sadlowski with a perjury prosecution if he testified before the PCR court consistent with his recantation statement, Sadlowski still would have withdrawn his recantation and asserted his Fifth Amendment privilege for a self-evident reason: by the time he was finally called to testify before the PCR court, Sadlowski was represented by his own, independent counsel who would not and did not place Sadlowski in jeopardy of yet another prosecution. Even if one assumes either extreme—either that there was absolutely no mention of anything from the prosecutor or that there was an outright, overt and malicious threat from the prosecutor—the result would have been the same as that which occurred here. Sadlowski would have withdrawn his recantation and he would have asserted his privilege against self-incrimination. Therefore, even if one concurs in the majority's analysis that results in a finding of prosecutorial interference with Sadlowski, those actions were harmless error.

### C.

Alternatively, if one assumes that there is factual support in this record for the result the majority reaches, that there is no

procedural impediment to applying the legal standard the majority advances, that the PCR court erred in refusing to consider Sadlowski's testimony or require that he be immunized, and that the error was not harmless, the remedy crafted by the majority is not among those this Court has the authority to, or should, grant. The Legislature has made it clear that the grant of testimonial immunity is a discretionary function of the executive, not of the judiciary. *N.J.S.A.* 2A:81–17.3 requires a written request from "the Attorney General or the county prosecutor with the approval of the Attorney General" as a necessary pre-condition to a court having the basic power to "order [a person who refuses to answer a question or produce evidence of any other kind on the ground that he may be incriminated thereby]." [12]

Our Constitution explains that

[t]he powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution.

[*N.J. Const.* art. III, ¶ 1.]

"The doctrine of separation of powers is a fundamental principle of our State government." *Communications Workers of Am. v. Florio,* 130 *N.J.* 439, 449, 617 *A.2d* 223 (1992). And, Article III, paragraph 1 of the New Jersey Constitution "contemplates that each branch of government will exercise fully its own powers without transgressing upon powers rightfully belonging to a cognate branch." *Knight v. Margate,* 86 *N.J.* 374, 388, 431 *A.2d* 833 (1981). In a conceptually indistinguishable context—whether the executive has the discretion to charge a person suspected of a criminal offense—we made clear that "[t]he constitutional princi-

---

[12] The federal parallel to New Jersey's immunity statute, 18 *U.S.C.* § 6003, also requires "the request of the United States Attorney" as a necessary condition precedent to an "order requiring [a witness] to give testimony or provide other information which he refuses to give or provide on the basis of his privilege against self-incrimination." Accordingly, no federal case extends the power to grant judicial immunity beyond the limited circumstances when, as a last resort, it is necessary to cure prosecutorial misconduct at trial.

ple of separation of powers discourages judicial review of the decisions of the executive branch of government." *State v. Di Frisco*, 118 *N.J.* 253, 265, 571 *A.2d* 914 (1990); *see also In re Yaccarino*, 101 *N.J.* 342, 353, 502 *A.2d* 3 (1985) (holding that "[a]ny decision by the Attorney General's office not to present this matter to a grand jury involves a discretionary determination by the executive branch"). Simply said, the discretionary power to grant immunity rests exclusively in the executive, and not the judiciary. If the executive chooses to exercise that power, our courts are required to issue an order of immunity. In the absence of that election by the executive, our courts are powerless to grant immunity.

The correctness of the separation of powers limitation on this Court's power to grant immunity is not disputed by the majority. It is in tacit acknowledgement of that limitation that the majority does not directly order the grant of immunity in this case but, instead, gives the State the "choice" of either granting Sadlowski immunity or suffering the loss of Sadlowski's trial testimony in its entirety. *Ante*, 184 *N.J.* at 264–65, 877 *A.2d* at 247. That procedure seeks to accomplish indirectly what cannot be done directly. Acknowledging that the State has already refused to grant Sadlowski testimonial immunity, *ante*, 184 *N.J.* at 247, 877 *A.2d* at 237, the majority asserts that it "will not compel the State to grant Sadlowski testimonial immunity. If it does not, however, [the majority] direct[s] the PCR court to disregard Sadlowski's trial testimony in full." *Ante*, 184 *N.J.* at 264, 877 *A.2d* at 247. There is no basis for that result.

Even if this Court has the inherent power to grant immunity, no prior authority from this Court, and singularly few cases from our lower courts, even address that proposition. That paucity of authority alone is more than sufficient cause to tread lightly. Indeed, only one case from our Law Division even purports to recognize that our courts have "the inherent power to grant use immunity to a defense witness in order to vindicate both the witness' Fifth Amendment rights and the defendant's due process

rights." *State v. Summers*, 197 *N.J.Super.* 510, 514, 485 *A*.2d 335 (Law Div.1984). Yet, even in that case the request for judicial immunity was denied. The court explained that "[t]he availability of such relief is limited only to those appropriate circumstances when it is truly required by due process." *Id.* at 516, 485 *A*.2d 335. The court nonetheless held that "the requested immunity is an extraordinary one, which should only be granted in the clearest of circumstances. Defendant's claim does not approach the required standards." *Id.* at 518, 485 *A*.2d 335. Less than one month after *State v. Summers* was approved for publication, the Appellate Division explicitly rejected its reasoning, explaining that

[a] trial court has recently stated that a judge in certain circumstances may be required by due process considerations to grant a witness called by a defendant use immunity. But prior cases indicated that *a judge does not have power to grant use immunity.* Rather *the procedure for a witness to obtain such immunity is statutory.*

[*State v. Jordan*, 197 *N.J.Super.* 489, 504 n. 5, 485 *A*.2d 323 (App.Div.1984) (citations omitted) (emphasis supplied).]

*See also State v. Cito*, 213 *N.J.Super.* 296, 301–02, 517 *A*.2d 174 (App.Div.1986), *certif. denied*, 107 *N.J.* 141, 526 *A*.2d 203 (1987) (describing view that "court has inherent power to grant use immunity to a defense witness who claims the Fifth Amendment privilege" as a "minority position" that does not "prevail[ ] in the State of New Jersey").

It cannot be said more plainly: there simply is no precedent for the extraordinary step the majority takes today and, to the contrary, every precedent in this State specifically eschews what this Court orders.

## D.

That, however, does not entirely answer the issue before us. If, as is assumed here, there is a factual foundation for requesting relief, there is no procedural impediment for requesting relief, and there is legal authority for granting relief, the proper form of relief nevertheless must be fashioned. Unlike the "choice" adopted by the majority, and assuming for these purposes only

that any relief at all is warranted, that relief should take the form of a remand to require that the PCR court develop a complete record by taking *all* of Sadlowski's testimony—his trial testimony, his recantation, and the withdrawal of his recantation—into account in determining whether defendant's conviction and sentence, as earlier affirmed by this Court, are constitutionally infirm. Assuming relief is warranted, it is only against the backdrop of a full and complete record that defendant's new trial claim can be fairly adjudged; the remedy adopted today does not achieve that result.

### III.

For the reasons detailed above, I respectfully dissent.

*For remandment*—Chief Justice PORITZ, and Justices LONG, LaVECCHIA, ZAZZALI, ALBIN and WALLACE—6.

*Dissenting*—Justice RIVERA–SOTO—1.