**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1761-23

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

MICHAEL A. DOTRO,

     Defendant-Appellant.

_____

Submitted April 23, 2026 – Decided May 6, 2026

Before Judges Mawla and Marczyk.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Indictment Nos. 14-10-1168, 14-10-1178, 17-08-0870 and Accusation No. 17-08-0759.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Amira R. Scurato, Designated Counsel, on the brief).

Linda Estremera, Middlesex County Prosecutor, attorney for respondent (Elizabeth K. Gibbons, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

Defendant Michael A. Dotro appeals from a November 2, 2023 order denying his petition for post-conviction relief (PCR) following an evidentiary hearing. We affirm.

Judge Pedro J. Jimenez, Jr. was the designated trial judge in defendant's case and conducted the pre-trial conference, plea hearing, sentencing, and the PCR motion and its evidentiary hearing. Prior to these events, defendant filed several motions, which were heard by different judges, and bear on the issues before us.

Defendant was an Edison Township police officer when he committed most of his crimes. The initial charges were filed against defendant and his wife related to an arson in June 2014. A superseding indictment followed on August 2, 2017. It charged defendant with: one count of second-degree conspiracy to commit arson, retaliation for past official action, and criminal mischief, N.J.S.A. 2C:5-2, N.J.S.A. 2C:17- 1(a)(1), N.J.S.A. 2C:27-5, and N.J.S.A. 2C:17-3(a); one count of second-degree official misconduct, N.J.S.A. 2C:30-2(a) and (b); one count of second-degree aggravated arson, N.J.S.A. 2C:17-1(a); five counts of first-degree attempted murder, N.J.S.A. 2C:5-1 and N.J.S.A. 2C:11-3(a)(1); one count of third-degree criminal mischief, N.J.S.A. 2C:17-3(a)(1); one count of third-degree unlawful possession of a destructive device, N.J.S.A. 2C:39-3(a);

2

one count of fourth-degree retaliation for past official action, N.J.S.A. 2C:27-5; and one count of third-degree hindering his own apprehension or prosecution, N.J.S.A. 2C:29-3(b)(4). This indictment also charged defendant's wife with fourth-degree hindering of defendant's apprehension or prosecution.

On October 23, 2014, a second indictment issued involving unlawful items found in defendant's duty bag during the arson investigation and his slashing the tires of his ex-girlfriend, Courtney Stryker. This indictment charged defendant with: one count of second-degree conspiracy to commit criminal mischief, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:17-3(a); one count of fourth-degree criminal mischief, N.J.S.A. 2C:17-3(a)(1); one count of third-degree computer criminal activity, N.J.S.A. 2C:20-25(a); one count of third-degree disclosure of data from wrongful access, N.J.S.A. 2C:20-31; three counts of second-degree official misconduct, N.J.S.A. 2C:30-2(a) and (b); two counts of fourth-degree prohibited weapons and devices, N.J.S.A. 2C:39-3(e); one count of fourth-degree possession of an imitation firearm for an unlawful purpose, N.J.S.A. 2C:39-4(e); one count of fourth-degree conspiracy to distribute marijuana, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:35-5(b)(12); and one count of second-degree pattern of official misconduct, N.J.S.A. 2C:30-7(a) and N.J.S.A. 2C:30-2. Defendant was also charged with one count of disorderly persons criminal

mischief, N.J.S.A. 2C:17-3(a)(1); one count of disorderly persons possession of marijuana, N.J.S.A. 2C:35-10(a)(4); and one count of disorderly persons possession with intent to use drug paraphernalia, N.J.S.A. 2C:36-2. His wife was charged with two second-degree offenses and a fourth-degree offense.

The third indictment related to crimes revealed by text messages obtained from defendant's phone. This indictment charged defendant with: one count of fourth-degree conspiracy to retaliate for past official action, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:27-5; two counts of second-degree official misconduct, N.J.S.A. 2C:30-2(a) and (b); one count of third-degree computer criminal activity, N.J.S.A. 2C:20-25(a); and one count of second-degree pattern of official misconduct, N.J.S.A. 2C:30-7(a) and N.J.S.A. 2C:30-2. Three other Edison police officers were also indicted on related crimes.

Early in the morning on May 20, 2013, a fire began to engulf the home of Edison Police Captain Mark Anderko while he and his family were asleep. The family escaped the flames and called first responders at 3:59 a.m. After the fire was put out, Middlesex County Prosecutor's Office (MCPO) arson investigator Todd O'Malley discovered an improvised incendiary device comprised of two plastic one-gallon jugs filled with gasoline and topped with a rag, which functioned as a wick.

4

Although Anderko did not know who tried to burn down his home, Edison Chief of Police Thomas Bryan suspected it was defendant because Bryan and Anderko had recently disciplined defendant. The investigation revealed defendant was a suspect in a fire on his neighbor's property in 2008. Although the cause of that fire was never determined, the neighbor suspected defendant because they were having a property dispute.

O'Malley interviewed defendant, his wife, and other witnesses. Defendant denied any involvement in the fire and claimed he was home the night it happened. His wife echoed the alibi. O'Malley obtained warrants to search defendant's home, vehicles, and the couple's cell phones. The phone records showed defendant and his wife were awake and texting each other before the Anderko fire.

Another ex-girlfriend, Rachel Zogg, heard about the Anderko fire and suspected defendant was involved. When they were together, defendant told her he set fire to a neighbor's property as retaliation against them and offered to help burn her ex-boyfriend's car to get revenge on him by using a device like the one used at Anderko's home.

Defendant also told Stryker about the fire he set on the neighbor's property. He also said he and his wife slashed Zogg's tires. Investigators found

5

texts between defendant and his wife regarding their involvement in the tire slashing. They also found texts between defendant and Stryker arranging to buy marijuana, which he bought from her while he was on duty.

Inside defendant's home, investigators found towels, rags, and gasoline-scented jugs matching the ones used in the device at Anderko's home. Defendant's vehicle contained a towel, which smelled of gasoline. The investigation revealed defendant's wife worked at a medical center, which stocked the same towels used in the device on Anderko's residence. Defendant's vehicle contained his police duty bag, which had marijuana; a marijuana pipe; brass knuckles; a blackjack; and an airsoft pistol with a blackened tip.

Defendant hired a defense attorney with forty years of experience, who zealously represented him over four-and-one-half years. Counsel filed numerous motions on defendant's behalf, including to: exclude evidence and communications based on the marital privilege; dismiss parts of an indictment; exclude text messages; compel inspection of defendant's vehicle; have a N.J.R.E. 104 hearing to preclude the admission of drug evidence; compel a bill of particulars; reduce and modify bail; hold a <u>Franks</u>[1] hearing; and suppress the evidence seized from defendant's home and vehicles.

---

[1] <u>Franks v. Delaware</u>, 438 U.S. 154 (1978).

The Franks motion claimed O'Malley's affidavit in support of the warrant applications intentionally misled the court. The affidavit relied, in part, on video surveillance investigators obtained from a convenience store showing a vehicle resembling defendant's traveling to and from the Anderko home before and after the fire. Counsel argued O'Malley, without adequate proof, misrepresented the vehicle was defendant's to influence the court to grant the search warrants. O'Malley's affidavit was also misleading because it discussed the 2008 fire at the neighbor's home without informing the court the cause of the fire was inconclusive.

A motion judge made detailed oral findings and denied the request for a Franks hearing on February 9, 2015. He observed O'Malley's affidavit was based on: the physical evidence recovered from the Anderko property; the evidence defendant had motive because Anderko had disciplined him; the investigation, which revealed defendant had a history of retaliating against others; and O'Malley's investigatory experience. Given the totality of the circumstances, the judge concluded "O'Malley presented ample relevant information to obtain the warrants" and defendant did not show the affidavit contained any materially false or misleading statements.

A-1761-23

The judge found the defense's arguments regarding the video were more of a "legal defense as opposed to [impelling a] finding that the investigator's information was false or recklessly made." The information about the 2008 fire was relevant because it discussed defendant's year-long feud with the neighbor preceding the fire. O'Malley "collected hearsay information that led him to create a full report as to [defendant]'s history and perceived proclivities. The inclusion of this analysis coupled with the information ascertained from others was proper and at no point falls into the realm of intentionally misleading the [c]ourt."

On September 16, 2016, defendant pled guilty to fourth-degree conspiracy to commit retaliation for past official action after the court denied a defense motion to dismiss. On January 20, 2017, defendant was sentenced to two years of probation; he also forfeited his job and the ability to hold any public office.

Soon after defendant's plea, investigators discovered more evidence in the arson case, namely, texts between defendant and another officer in early April 2013 about their plan to set fire to the home of another Edison Police captain. A new complaint issued against defendant on November 4, 2016.

In December 2016, defendant's attorney filed several motions in the duty-bag case and moved to dismiss several counts in the superseding indictment.

A-1761-23

Those motions were denied on March 10, 2017. That same month, the court scheduled trial on the duty-bag indictment for August 14, 2017. The defense promptly moved to preclude the mention of the drugs found in the duty bag at trial. The court denied the motion on July 26, 2017. On August 2, 2017, the superseding indictment on the arson case was issued, incorporating the charges for the Anderko fire and conspiracy to commit arson uncovered in 2016.

During this time, defendant's attorney attempted to resolve the remaining cases by seeking a ten-year global plea offer from the State. However, defendant rejected the idea and defense counsel notified the prosecutor. On August 14, 2017, at a pre-trial conference, the prosecutor informed the judge defendant declined the ten-year plea offer. The prosecutor said the State had not extended an offer to defendant's wife, but if defendant had accepted the ten-year offer, the State would have offered her probation. Defendant's attorney confirmed the prosecutor's representation. Defendant was present and said nothing.

At the end of the pre-trial hearing, the prosecutor requested a sidebar. He informed the judge and defense counsel someone had contacted Zogg twice in the previous ten days, trying to convince her not to testify. Investigators discovered the number that called Zogg belonged to a prepaid phone purchased days earlier at a Target. When they found the buyer, he said defendant instructed

9

him to buy the phone and use it to prevent Zogg from testifying. Investigators also found texts from defendant requesting purchase of the phone. Defendant was charged with conspiracy to commit witness tampering on August 21, 2017.

The prosecutor informed defendant's attorney the State now had a new witness who confessed to helping defendant tamper with a witness who was going to testify against defendant. Also, defendant's wife had agreed to testify against him in the two original cases in exchange for pre-trial intervention. The prosecutor extended a global plea offer of twenty years of incarceration, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2, which would expire at the start of the duty-bag trial scheduled for August 21, 2017.

In response, defendant's attorney attempted to negotiate a fifteen-year and later a sixteen-and-one-half-year sentence, but the prosecutor refused. Defense counsel called defendant's wife's attorney, who confirmed she agreed to testify for the State. Defendant's attorney then went to discuss the plea offer with defendant. Defendant requested transcripts of his wife's statement and the statement of the witness in the tampering case, but they would not be available before the plea cutoff.

On August 21, 2017, defendant pled guilty to one count each of: second-degree aggravated arson and first-degree attempted murder in the arson case;

and second-degree official misconduct in the duty-bag case. Defendant waived indictment in the witness tampering case and pled guilty to third-degree conspiracy to commit witness tampering, N.J.S.A. 2C:5-2(a)(1) and N.J.S.A. 2C:28-5(a)(5). He testified no one had forced or coerced him into waiving the indictment.

In exchange for the plea, defendant testified he understood the State would recommend an aggregate sentence of twenty years, subject to NERA. When the judge asked him if he understood his guilty plea signified he: was satisfied with his attorney's services; had received and reviewed all the discovery; and had enough time to discuss the case with his attorney, defendant answered all these things were "very true." Defendant testified no one had forced or coerced him into giving up his right to a jury trial. When asked if he was satisfied with his attorney's advice, he responded: "Very much so, yes." He testified defense counsel had answered all his questions, there were no other reasons why he was entering the guilty plea, no one had threatened or coerced him into entering the plea, and he was guilty. Defendant answered similarly when the judge questioned him about the plea forms he signed. When offered the opportunity to ask the court any questions, defendant declined. Defendant agreed he entered the plea knowingly, intelligently, and voluntarily.

11

When defendant committed conspiracy to tamper with a witness, he violated the probation he received in January 2017. After defendant waived a hearing on the violation of probation, the judge heard the parties' sentencing arguments. Despite the plea agreement and lengthy plea negotiations, defense counsel argued defendant should receive a sentence of less than twenty years. Counsel cited numerous letters from defendant's friends and family, which the judge read, as well as the fact defendant had built businesses and become "an industrious young man" while on probation, as evidence he could be rehabilitated. The judge then asked defendant if he wanted to speak on his own behalf, and he declined.

In its presentation, the State observed the twenty-year negotiated sentence was not excessive because there were multiple victims, and if defendant's sentences ran "consecutively, . . . a conservative read" would result in "sentencing exposure . . . north of [fifty] or [sixty] years." The State argued defendant lacked remorse because he said nothing in allocution.

Judge Jimenez made comprehensive findings at sentencing, which we need not repeat here. He discussed and found aggravating factors two, three, four, six, eight, nine, and ten "substantially outweigh[ed] the mitigating factors." The judge rejected the defense's argument defendant had been rehabilitated and

the letters from family and others espousing defendant's good character and deeds.

The judge made extensive findings about how defendant committed his crimes while a member of the police force and that his contact with the criminal justice system had increased while in uniform. Defendant's crimes were fraudulent, a breach of public trust, denigrated the police force, and degraded public trust in the criminal justice system. The fact defendant had incurred new charges while awaiting trial showed he would re-offend and could not be deterred, given his two decades of violations. The judge had "no illusions whatsoever that . . . the criminal justice system" would reform defendant. He was "taken aback" that defendant declined to speak at sentencing.

The judge concluded the negotiated sentence was within the range authorized by law and defense counsel had negotiated a favorable result. In accordance with the plea agreement, the judge sentenced defendant to a twenty-year term subject to NERA, followed by five years of parole supervision. The judge reviewed defendant's rights to appeal with him, including that he could lose the right to appeal if he failed to meet the filing deadline under the Rules of Court. Defendant confirmed he understood his appeal rights.

A-1761-23

Defendant never filed a direct appeal. In June 2021, he filed a PCR petition, alleging he was entitled to relief because the <u>Franks</u> motion should have been granted and defense counsel was ineffective. Defendant certified counsel failed to inform him the arson conviction would make him ineligible to serve his sentence in minimum security status and unable to have certain employment opportunities while incarcerated. Counsel also forced defendant to accept the sentence without interviewing the witnesses in the witness tampering case or reviewing their statements to investigators. Defendant claimed counsel also failed to interview or obtain his wife's statement and misled him to believe she made an inculpatory statement to get defendant to enter the plea.

Defendant certified defense counsel told him the sentence would be ten to twenty years and based upon defendant's mitigating circumstances the judge would sentence him to ten years. At sentencing, defense counsel failed to list the mitigating factors, including his "prior record, the list of achievement[s], awards within the community[,] . . . years served as a police officer," and that defendant had owned a business for five years, in rebuttal to the State's argument of the aggravating factors.

Defendant blamed his failure to speak at sentencing on defense counsel, claiming counsel instructed him not to speak out of concern he would "'slip up'

and say [he] did not commit these crimes and that making a sentencing speech would not make a difference in or possibly worsen the sentence." This prejudiced defendant because it resulted in the judge finding he lacked remorse.

Defendant further claimed his attorney "never contacted [him] with an update on whether a global plea agreement was offered." He asserted he would have taken the ten-year NERA offer, but counsel said it expired without giving defendant "the opportunity to contemplate" it.

Following the sentencing, defendant claimed he and his family contacted counsel to obtain his file so defendant "could prepare to file an appeal prior to hiring a new lawyer." However, counsel refused to provide the file.

During the case, defendant claimed he wanted to transfer venue outside of Middlesex Vicinage because: the Edison Township Police Department had generally received negative media attention over the years; several Edison Township police officers were under investigation and media scrutiny; defendant was involved "in a highly[-]publicized incident in July 2006" regarding an undocumented individual; in 2008, the MCPO suspected him of involvement in a missing police vehicle, which he claimed caused a conflict between him and the MCPO; and the MCPO investigated defendant for verbally abusing an Edison Township employee. Defendant relayed these concerns to

counsel, who responded he preferred the matter to remain in Middlesex Vicinage, but then told defendant he had filed the motion to silence him, only for defendant to learn he had never filed it.

The judge granted defendant an evidentiary hearing. The witnesses at the hearing were: defense counsel; defendant's mother and brother; and defendant.

Defense counsel testified regarding his efforts to convince the court to grant the Franks hearing, why he disagreed with the ruling, and his subsequent unsuccessful attempt to seek interlocutory review. Counsel had retained an expert for the Franks hearing and filed several other motions, including for discovery, which he won at the trial level and on appeal after the State challenged the ruling on an interlocutory basis. He also opposed motions filed by the State and filed "[e]xtensive briefs."

Defense counsel explained he did not seek a venue transfer due to concern the publicity would lead to a biased jury. The risks of moving the case outside the vicinage outweighed the benefits. There was no reason to transfer venue. Counsel denied telling defendant he had filed the venue transfer motion.

Defense counsel recounted the ten-year offer was made prior to the pre-trial conference. He discussed the offer with defendant, but defendant did not want to take it. Defendant was not in custody at the time. At the pre-trial

conference, defendant was standing next to counsel, but defendant did not discuss the ten-year offer or indicate he was unaware of it. Defendant never raised the ten-year offer during the subsequent jury selection.

Defense counsel learned the plea offer had changed from ten to twenty years when the prosecutor called him one evening to inform him defendant was arrested and jailed on the tampering charge. Counsel "immediately" went to the jail and discussed the plea offer with defendant, who was very upset and disturbed about the new charge.

Defense counsel explained he did not have the offer in writing because "[t]hings were moving at a rapid pace that weekend" but the prosecutor told him defendant's wife had given a proffer and was prepared to testify. He asked the prosecutor for a fifteen- and then a sixteen-and-one-half year sentence, but the prosecutor "was adamant [the offer] . . . was the [twenty years]. And it would . . . expire[] . . . if [they] started trial." Defense counsel called the wife's defense attorney, who confirmed she had given a proffer and was prepared to testify.

Defense counsel developed a specialized practice defending police and corrections officers. He recalled defendant asked him questions about where he would be serving the sentence. Counsel advised the Department of Corrections (DOC) had a secure facility for police officers and informants, but defendant did

not want to go to that facility because he wanted to be closer to his family. Defense counsel "remember[ed] spending a lot of time going over the negative aspects of going forward versus taking the plea." They included the fact defendant had been arrested for tampering in the middle of a trial, "which shed an entirely different light on the trial [they] were about to commence, which carried multiple five-year misconduct parole disqualifiers, as well as [exposure under] a pattern of misconduct statute."

Defendant and counsel discussed the probability of an acquittal, given defendant's wife and Zogg had agreed to testify against him. Counsel told defendant he asked the prosecutor if there was a written statement from defendant's wife and learned there was none because of the shortness of time, and the plea offer would be revoked if it was not accepted before trial. He recounted defendant "was very uncomfortable" when he heard the news. Counsel was less concerned about the tampering charge and more concerned about its "[e]ffect on the trial . . . [about] to commence, and the subsequent even more serious charge of the attempted murder." He recommended defendant accept the twenty-year offer because the likelihood of conviction had "substantially" increased.

18

Counsel denied threatening to quit the trial or forcing defendant to accept the plea. He was ready to represent defendant in the tampering case. Even though counsel told defendant he intended to retire, his retainer did not limit the number of years he would represent defendant. The urgency to accept the plea offer was prompted by the State bringing more charges.

Defendant wanted to know what he could do in prison. Counsel "told him he could get classes with his intellect and discipline . . . [a]nd . . . eventually he would be assisting inmates." Based on the attempted murder charge, he advised defendant he would have to serve seventeen-and-one-half years, but "he might be able to . . . get into a halfway house or other program[] prior to that time." Defense counsel admitted he did not know the arson conviction would affect what defendant could do in prison. He later learned "that having an arson conviction brings some . . . restrictions into play with the [DOC]."

Defense counsel testified he advised defendant not to say anything at sentencing because based on counsel's understanding of defendant's "state of mind and everything else," he "was convinced beyond any doubt that the sentence . . . was going to be . . . [a twenty-year NERA sentence], and [counsel] thought him speaking was not going to help" and would only hurt. Counsel told

19

defendant he would argue for a lesser sentence, but he felt it was "an exercise in futility because of the . . . detailed negotiations involving all of the cases."

After the sentencing, defendant did not discuss an appeal with defense counsel, and neither defendant nor anyone on his behalf ever asked him to file one. Counsel did not recall anyone from defendant's family contacting him for the file and he never denied a request for the file. Defendant had copies of every document.

Defendant's mother testified she called defense counsel three or four days after sentencing to find out where defendant was housed. Counsel invited her to meet him at his office and advised her defendant was temporarily housed in Trenton State Prison, but he did not know where he would be transferred to. Four weeks later, defendant called his mother to inform her he was in Rahway State Prison. She testified he asked her to contact defense counsel to tell him defendant needed to speak with him and to "ask him also if he filed." Defendant's mother did not know what "filed" meant. Specifically, PCR counsel asked: "Do you know what [it] meant to see if he filed? Did you know at that point what [defendant] was talking about?" Defendant's mother answered: "No. He just said to me[,] . . . tell him I need to talk to him over the phone. If he could call me and make sure that he filed."

Defendant's mother claimed she could not reach defense counsel. Defendant called her again and requested she ask if counsel could make copies of his file. She ultimately reached defense counsel and asked him "did you file? He said no. And [she did not] know what it meant." Defendant's mother then asked for his file, and she claimed defense counsel replied he could not make copies and had to keep the file for seven years unless she retained an attorney, in which case he could release the file to an attorney.

Defendant's brother testified he emailed defense counsel and spoke with his assistant about "getting [defendant's] files, and just trying to have him call us back so we [could] speak to him. And just relay the message that [defendant] had asked us to do."

Defendant testified a <u>Franks</u> hearing was critical, and he told defense counsel he "wanted to exhaust every avenue" but after the interlocutory appeal was denied, counsel said, "we were done," and did not explain the possibility of an appeal to the Supreme Court. He reiterated his claims regarding the change of venue and that counsel initially said he would not file, then said he did file the motion, and the judge had denied it.

Defendant claimed counsel called him and said he would relay a plea offer when he received one from the State. The next time he heard there was a plea

21

offer was when the prosecutor informed the court during the pre-trial conference defendant had turned down the ten-year NERA sentence. Defendant testified he did not "remember hearing any type of plea offer. And . . . remember[ed] turning to [counsel], and giving him a quick tug, and he just waved [defendant] off." Defendant claimed when he attempted to discuss the plea offer outside of court, counsel told him it was "long gone."

Defendant recounted counsel's visit with him after the tampering charge was filed on the eve of trial. He reiterated counsel urged him to take the twenty-year offer because witnesses would be testifying against him and the offer would be expiring. Counsel did not tell him what his wife's proffer was. Defendant claimed counsel also told him he wanted to retire, the additional charge prolonged the litigation, and the retainer only covered five years of representation.

Defendant stressed he was satisfied with counsel's representation, and he did a good job on the pre-trial motions including going into the trial, through the plea, and up to the sentencing. However, he gave in to taking the twenty-year sentence because counsel made it sound like defendant did not have a choice. Defendant's "paramount" concern, more so than the length of the sentence, was his "safety and how [he would] be serving that sentence . . . based on [his]

22

housing, where would it be, [and what] jobs [he could] acquire within the prison." He took the plea based on the mis-advice regarding the incarceration.

Defendant also alleged counsel told him he could receive a sentence as low as ten years based on his mitigating factors. Counsel was confident the sentence would be less than twenty years. Defendant supplied counsel with the mitigating factors, namely, defendant was college educated, had community ties, had ten years of service in the police department, was a union delegate, and had raised money for charity—none of which counsel argued at sentencing.

Defendant testified counsel reviewed a statement defendant had prepared to read at sentencing and "dismissed it." Counsel told him not to speak at the sentencing because it would not make a difference, and he did not want defendant to say something that would get the plea offer revoked. He asserts this mis-advice led the court to find he lacked remorse.

Defendant claimed his conversation with defense counsel led him to believe the most time he would spend in maximum-security status was eight-and-one-half years. He would then transition to minimum security status, and onto a halfway house. However, because of the arson charge, he was ineligible for a work camp or halfway house and would have to serve the entire NERA sentence in a maximum-security facility. He could only be housed in certain

23

A-1761-23

areas as well. Defendant also learned the arson conviction prevented him from obtaining certain jobs in prison and limited his eligibility for programs to learn a new trade. Without the arson conviction, defendant could "work anywhere within the prison." Defendant, however, conceded he did not have any documents, proving he was denied admission to certain programs.

Defendant claimed he tried to contact counsel from prison because he "wanted to know what the next step [wa]s. [Wa]s there something that we c[ould] file, [wa]s there something that we c[ould] do? What [we]re we doing next? . . . [Wa]s there some type of relief." He recounted counsel visited him in April 2018, and the discussion revolved around the issues defendant was having due to the arson conviction. Counsel professed he did not know the ramifications of the arson conviction, told defendant it was too late to appeal, and defendant could address the issue in a PCR petition.

Defendant testified he once had his files, but his wife destroyed them after their divorce. He asked counsel for the file "to potentially work on [his] own appeal." Defendant claimed he never filed his own appeal because he physically could not do so from prison and he did not know how. He also "didn't know there was anything wrong until . . . the next year when the restrictions started to

24

come to light[ w]hen [he] got denied for [a] job[ and] . . . was placed on a separate housing list."

Judge Jimenez issued a detailed written opinion following the evidentiary hearing.  He found the <u>Franks</u> hearing argument was barred by <u>Rule</u> 3:22-4 because defendant failed to raise the argument on direct appeal.

Citing <u>State v. Bellamy</u>, 178 N.J. 127, 134 (2003), the judge found defense counsel was not ineffective for mis-advising defendant about his prison housing and privileges because "counsel only needs to explain the <u>direct or penal</u> consequences of a guilty plea."  Defendant's concerns regarding the security status and prison programs were "administrative consequences imposed by the prison administration . . . . These consequences [were] collateral and not of the magnitude to which due process call[ed] for their disclosure before accepting a plea deal."  Unlike mis-advice by counsel regarding the immigration consequences of a plea for example, "[t]he confines of maximum-security status do not follow [d]efendant after he served his sentence."

The judge observed the arson conviction was not an absolute bar to obtaining minimum custody.  Defendant pointed to N.J.A.C. 10A:20-4.5 as proof the arson conviction barred him from placement in a residential community program.  The judge noted this sort of placement required an inmate

to satisfy several eligibility criteria and "have an actual parole ineligibility date set by the New Jersy Parole Board or have less than two years to serve on the sentence." Defendant's claim was "more theoretical than actual" because his tentative parole date was not until 2034, and his conviction for attempted murder made "it uncertain he would not be deemed a danger to [the] community."

The judge found counsel was not ineffective "because it is impracticable, and frankly impossible, for an attorney to know how each [d]efendant will ultimately be classified and the consequences of [their] classification." Inmates are classified by an institutional classification committee that considers several criteria. The judge observed, "[g]iven the numerous variables that are involved in making [a] change in custody status, it is not practical that a defense attorney [would] be able to advise a [d]efendant with precision [as] to what custody status [they] will be assigned."

The judge found defendant's concerns regarding the restrictions associated with his arson charge were not the "tipping factor[,] which led [him] to plead guilty." Rather, it was the knowledge that during jury selection, the co-defendant in the witness tampering case was arrested and gave a confession "implicating him as a co-conspirator. A second witness was also implicated in that conspiracy who then provided a statement to police also implicat[ing] . . .

[d]efendant."  In other words, the State's case had "strengthened by the addition of these two witnesses . . . in addition to . . . [d]efendant's wife . . . who agreed to cooperate with the State."  The judge concluded defendant "recognized . . . the likelihood of conviction was more certain, as well as the now lengthier sentencing terms to be imposed."  These were the reasons why defendant accepted the plea and he "failed to show that but for trial counsel's misstatement he would have gone to trial."

The judge found defendant's claims defense counsel:  pressured him into the plea; refused to interview the co-conspirators in the witness tampering case or obtain their statements from police, and misled him to believe his wife had given a statement to police implicating him; and withheld discovery were "belied by the record."  He noted jury selection began on August 15, 2017, and concluded August 16.  Defendant was arrested for witness tampering on August 17.  The State made the twenty-year offer on August 18, defendant's wife participated in a proffer session with the MCPO on August 21 and agreed to testify, and trial was scheduled to begin August 22.

This timeline supported "that because of the fast-paced nature of the witness tampering investigation, none of the witnesses' statements were transcribed.  Additionally, because [defendant's wife] participated in a proffer

27

session rather than giving a formal statement to the police, the session was not recorded." The record showed "upon receiving [the State's] offer, . . . counsel engaged in several telephonic plea discussions with the . . . prosecutor regarding all aspects of the proposed plea offer." The judge credited defendant's claim counsel told him the twenty-year offer would expire if he did not accept it and counsel advised defendant he did not obtain written transcripts of the witness statements, but he concluded

> this "pressure" did not make trial counsel ineffective. In fact, it made him effective because the plea offer was only valid for [seventy-two] hours, [and] trial counsel was correct to tell [d]efendant that the plea was going to expire and . . . counsel made clear to [d]efendant what the two witnesses and [defendant's wife] were going to testify to in the upcoming trial.

The judge further rejected defendant's claim he needed to see the witnesses' written statements, noting he knew them "long before the State knew who they were."

Defendant's claim counsel misled or coerced him was not supported by the record. He "clearly realized that the 'jig was up' and that he was now looking at nearly a lifetime in prison . . . for all of the crimes he was charged with and which the State was now emboldened . . . to prosecute with the addition of these

28

witnesses."   The judge concluded "counsel performed effectively and in [d]efendant's best interests given [the] rapid turn of events in the case."

The judge rejected defendant's claims counsel never informed him about the ten-year offer, told him he would receive ten rather than twenty years, and failed to adequately represent him at sentencing.  He found defendant rejected the ten-year offer at the August 14 pre-trial conference because he "was present at the conference and never expressed any disagreement with counsel regarding the . . . plea offer. . . . Defendant well knew his rights and if he wanted to accept that offer[,] he easily could have stopped the proceedings and inquired about it." He "only considered pleading guilty after he was caught tampering with a State witness.  By that time the offer had doubled, and [defendant's] claim of error now rings hollow."

The judge rejected defendant's claim counsel told him he would be sentenced to ten years because "[a]s a former police officer [d]efendant was well[-]versed in the criminal justice system.  Moreover, he was college educated and had no difficulty reading or understanding the terms of the plea agreement." During the plea hearing, defendant told the judge "he read the agreement, discussed it with counsel[,] and had no questions about the agreement."  The judge also observed he "reviewed all of the terms of the agreement with

[d]efendant, who stated unequivocally that he understood it. In addition, [d]efendant expressed complete satisfaction with trial counsel's representation, had no questions or complaints, and declined an offer of additional time to speak to . . . counsel." Because the record showed defendant knew the terms of the plea agreement and "was being sentenced on four different files," any expectation of a ten-year sentence was unfounded.

The judge rejected the assertion counsel did not properly advocate for defendant at the sentencing. Not only did counsel advocate for a lesser sentence, "he spoke about [d]efendant's industriousness . . . that he started and ran a small business," was an expectant father, "referenced numerous character witnesses[,] . . . and highlighted the letters from [d]efendant's family in support of him." The judge concluded counsel's performance was not the issue. Instead, "given the serious nature of the charges . . . there is likely nothing trial counsel could have said or did at sentencing[, which] would have resulted in a different outcome."

The judge found defendant's claim the failure to seek a venue transfer was evidence counsel was ineffective lacked merit. Defendant's PCR petition did not point "to any inflammatory press[] articles that corrupted the trial atmosphere or had an actual effect on the impartiality of the jury panel." The judge concluded "defense counsel would not have been successful in any change

30

of venue motion by citing to the occasional bad publicity Edison Police received in the media over a several year period." The change of venue would not have remedied defendant's claims MCPO detectives were biased. The State's case would remain the same. And defendant's guilty plea mooted the issue.

Defendant's claims regarding counsel's failure to appeal and provide him with his file were rejected because he executed an appeal rights form showing he knew the timeline for appeal and the judge directly advised defendant of the timeline at sentencing. The judge observed defendant did not need trial counsel to file a notice of appeal and defendant never filed one manifesting an intent to appeal. After filing a notice of appeal, defendant could have obtained his file by seeking the assistance of appellate counsel, the public defender, or the court. The court filings in defendant's case could be obtained from eCourts.

The judge found the emails between defendant's brother and counsel's administrative assistant were not dispositive because they occurred nearly eight months after sentencing "and long after the deadline for filing [a] direct appeal had lapsed." The emails did not indicate defendant "intended to file [a] direct appeal and needed the trial file for that purpose." The judge noted the emails contradicted defendant's claim counsel withheld the file and instead indicated

31

the discovery defendant sought was timely sent to him and his brother by counsel, "as the [email] chain ends with no further demand for discovery."

The judge found defendant's claim counsel's overall performance was ineffective, lacked merit. Defendant's convictions had nothing to do with counsel's performance "but rather the substantial amount of evidence the State presented against [d]efendant. From the beginning[,] trial counsel had a clear strategy and theory of several cases that defense counsel vigorously attempted to demonstrate." Counsel was competent, experienced, and familiar with defendant's case. He filed "a litany of motions[,] including motions to dismiss all the indictments," suppress evidence, compel discovery, "and a motion for a bill of particulars as well as many others." The defense "also retained experts and personally examine[d] physical evidence."

The judge concluded defendant did not show counsel's performance was ineffective. Defendant also failed to show he would not have pled guilty and instead proceeded to trial but for counsel's alleged deficient performance.

I.

Defendant raises the following points on appeal:

> POINT I   BECAUSE DEFENDANT RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL, THE PCR COURT ERRED IN DENYING DEFENDANT'S PETITION FOR PCR.

(A) Legal Standards Governing Applications For Post-Conviction Relief.

(B) Defense Counsel Was Ineffective In A Myriad Of Ways Noted Below, And Actually Admitted To Some Of His Ineffectiveness. The PCR Judge Erred In Denying Relief.

(1) Counsel Admitted He Gave Incorrect Advice On A Matter The Defendant Found Significant To His Decision To Accept The Plea Offer Because Counsel Was Unaware Of The Specifics Governing Arson Convictions. . . .

(2) Counsel Admitted He Advised Defendant Not To Speak At Sentencing. Defendant Was Prejudiced Thereby . . . .

(3) Counsel Did Not Preserve The Appeal Of Denials Of Motions In The Plea Agreement, Did Not File A Notice Of Appeal, Did Not Ask The Public Defender's Office To Handle The Appeal, And Did Not Provide Defendant's File To His Family So An Appeal Could Be Perfected. . . .

(4) Counsel Pressured Defendant To Accept The New Plea Agreement Without Providing Discovery And Without Providing Sufficient Time To Consider It. . . .

(5) Counsel Did Not Discuss With Defendant The Global Ten-Year Plea Offer Before Rejecting It. . . .

33

II.

The PCR process affords an adjudged defendant a "last chance to challenge the 'fairness and reliability of a criminal [conviction].'" State v. Nash, 212 N.J. 518, 540 (2013) (quoting State v. Feaster, 184 N.J. 235, 249 (2005)). Consequently, "[i]f an error led to a miscarriage of justice in an earlier trial, the PCR proceeding must provide a meaningful opportunity to root it out." Ibid.

When a defendant's basis for relief is premised on a claim of ineffective assistance of counsel, they must show counsel's performance was deficient and the deficient performance prejudiced the defense. Strickland v. Washington, 466 U.S. 668, 687-88 (1984); State v. Fritz, 105 N.J. 42, 58-60 (1987). Where there is a guilty plea, a defendant must demonstrate: (1) counsel's performance was not "within the range of competence demanded of attorneys in criminal cases," and (2) "that there is a reasonable probability that, but for counsel's errors, [the defendant] would not have pled guilty and would have insisted on going to trial." State v. DiFrisco, 137 N.J. 434, 457 (1994) (alteration in original) (first quoting Tollett v. Henderson, 411 U.S. 258, 266 (1973); then quoting Hill v. Lockhart, 474 U.S. 52, 59 (1985)).

When a PCR court has conducted an evidentiary hearing, we defer to its "factual findings based on its review of live witness testimony[ and] . . . we will

uphold the PCR court's findings that are supported by sufficient credible evidence in the record." Nash, 212 N.J. at 540. "An appellate court 'should give deference to those findings of the trial judge which are substantially influenced by [their] opportunity to hear and see the witnesses . . . .'" State v. Elders, 192 N.J. 224, 244 (2007) (quoting State v. Johnson, 42 N.J. 146, 161 (1964)). "An appellate court's reading of a cold record is a pale substitute for a trial judge's assessment of the credibility of a witness [they have] observed firsthand." Nash, 212 N.J. at 540.

We do not defer to a PCR court's interpretation of the law. State v. Harris, 181 N.J. 391, 415 (2004). The legal conclusions of the PCR court are reviewed de novo. Ibid.

Pursuant to these principles and having reviewed the record in depth, we affirm substantially for the reasons expressed in Judge Jimenez's thorough and well-reasoned opinion. The arguments raised in Points I(B)(1), (3), (4), and (5) lack sufficient merit to warrant further discussion in a written opinion. R. 2:11-3(e)(2). We add the following comments regarding a part of the arguments raised in Point I(B)(3) and the argument raised in Point I(B)(2).

Part of defendant's claim of ineffective assistance of counsel in Point I(B)(3) is counsel did not preserve the right to appeal from all the adverse pre-

trial motion determinations. However, the PCR petition only challenged the result of the motion for a <u>Franks</u> hearing. The general claim counsel was ineffective for not preserving the right to appeal from all the motion rulings was not a part of the PCR petition and was improperly raised for the first time on appeal. For these reasons, we decline to consider the argument. <u>State v. Arthur</u>, 184 N.J. 307, 327 (2005).

As regards the motion seeking a <u>Franks</u> hearing, the State correctly notes this motion was preserved for appeal pursuant to <u>Rule</u> 3:5-7(d), but defendant never pursued an appeal. Regardless, the motion judge's findings were unassailable, and we are not convinced the failure to appeal his decision was evidence of ineffective assistance of counsel.

Defendant's failure to speak at sentencing was not the product of ineffective assistance of counsel as he asserts in Point I(B)(2). In reviewing claims of ineffectiveness, there is a strong presumption defense counsel "rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." <u>Strickland</u>, 466 U.S. at 690. "[C]omplaints 'merely of matters of trial strategy' will not serve to ground a constitutional claim of inadequacy . . . ." <u>Fritz</u>, 105 N.J. at 54 (quoting <u>State v.</u>

Williams, 39 N.J. 471, 489, cert. denied, 374 U.S. 855 (1963), overruled in part on other grounds, State v. Czachor, 82 N.J. 392, 402 (1980)).

"The quality of counsel's performance cannot be fairly assessed by focusing on a handful of issues while ignoring the totality of counsel's performance in the context of the State's evidence of [the] defendant's guilt." State v. Castagna, 187 N.J. 293, 314 (2006). "As a general rule, strategic miscalculations or trial mistakes are insufficient to warrant reversal 'except in those rare instances where they are of such magnitude as to thwart the fundamental guarantee of [a] fair trial.'" Id. at 314-15 (alteration in original) (quoting State v. Buonadonna, 122 N.J. 22, 42 (1991)). "'[A]n otherwise valid conviction will not be overturned merely because the defendant is dissatisfied with his or her counsel's exercise of judgment.'" State v. Allegro, 193 N.J. 352, 367 (2008) (quoting Castagna, 187 N.J. at 314).

The record demonstrates defense counsel's advice to defendant to not speak at sentencing was sound. Defendant clearly lacked good judgment considering he engaged in witness tampering on the eve of trial. It is apparent to us defense counsel was keenly aware of his client's lack of discretion. And although defendant has not provided us with, or detailed what, his intended

allocution would have been, it is clear counsel thought the better of it and directed his client not to say anything in his best interests.

Although the State referenced defendant's silence and the judge mentioned it during sentencing, when we look at the entire record and the several other findings the judge made at sentencing underscoring the seriousness of defendant's crimes, it is clear the lack of allocution would not have moved the proverbial needle. The numerosity of defendant's crimes and their timing; the nature of the evidence against him, including the several witnesses prepared to testify against him; the several victims of his crimes; and the judge's detailed sentencing findings about how the offenses all occurred while defendant held a position of the highest public trust, clearly convince us nothing in mitigation, including a statement of remorse, would have led to a different result.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-1761-23